**UNITED STATES**

v.

**Jessie A. QUINTANILLA, Sergeant (E–5), U.S. Marine Corps.**

**NMCCA 9801632.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 5 Dec. 1996.

Decided 31 Jan. 2005.

LtCol Dwight H. Sullivan, USMCR, Appellate Defense Counsel.

Maj Michael R. Osborn, USMC, Appellate Defense Counsel.

LT M. Eric Eversole, JAGC, USNR, Appellate Defense Counsel.

LT Michael Navarre, JAGC, USNR, Appellate Defense Counsel.

LT Jason Grover, JAGC, USN, Appellate Defense Counsel.

LT Elysia Ng, JAGC, USNR, Appellate Defense Counsel.

CDR Robert P. Taishoff, JAGC, USN, Appellate Government Counsel.

LT Frank Gatto, JAGC, USNR, Appellate Government Counsel.

LT Lars C. Johnson, JAGC, USNR, Appellate Government Counsel.

Capt. Wilbur Lee, USMC, Appellate Government Counsel.

Before CARVER, RITTER and PRICE, Appellate Military Judges.

PRICE, Senior Judge:

This is a case about a sergeant of Marines who shot his commanding officer (CO) and executive officer (XO) while they were in their command office suite, killing the XO and seriously wounding the CO. The appellant's sentence included the death penalty. Because the military judge committed an error that materially prejudiced a substantial right of the appellant by granting a prosecution challenge for cause, we must set aside the findings and the sentence and order a rehearing.

Contrary to his pleas, the appellant was convicted of attempted unpremeditated murder (two specifications), violation of a general order by carrying and concealing a .45 caliber pistol, premeditated murder, aggravated assault by pointing a dangerous weapon (two specifications), carrying a concealed weapon, communicating a threat, and obstructing justice. The appellant's offenses violated Articles 80, 92, 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 892, 918, 928, and 934. A general court-martial comprised of 12 members unanimously sentenced the appellant to death, reduction to pay grade E–1, and total forfeiture of pay and allowances. The convening authority approved the sentence as adjudged.

We have carefully considered the record of trial, the appellant's 49 briefed assignments of error and 83 summary assignments of error, the *amici curiae* brief, the Government's response, the appellant's Reply, the Petition for New Trial, the Motion for Summary Disposition, the Supplemental Assignment of Error,[1] all other appellate pleadings, and the parties' excellent oral arguments. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). The Petition for New Trial and the Motion for Summary Disposition are denied. While our decision as to a challenge for cause renders moot all other assignments of error, four of the additional issues warrant discussion.[2]

## I. Background

In March of 1996, the appellant was assigned to Marine Aviation Logistics Squadron 39 at Camp Pendleton, California. He worked on the night crew at the squadron, meaning that he routinely reported for work in mid-afternoon. The squadron CO was Lieutenant Colonel (LtCol) Thomas A. Heffner, United States Marine Corps (USMC). The XO was LtCol Daniel W. Kidd, USMC.

On the morning of 5 March 1996, the appellant consumed an undetermined quantity of alcohol, then left his home to drive to

---

1. The Motion for Leave to file Supplemental Assignment of Error is granted.

2. In our opinion, we will use various acronyms, including TC—trial counsel (prosecutor), MJ—

military judge, IMC—individual military counsel (trial defense counsel selected by the appellant), and ADC—assistant defense counsel. Other acronyms are defined in the course of the opinion.

work. When he left his car parked in the squadron parking lot, he had a .45 caliber pistol tucked into his clothing. The appellant entered the squadron spaces, walked upstairs to the command office suite, then waited outside the XO's office until other Marines left.

A uniform inspection was scheduled for the night crew at 1500. In preparation for the inspection, LtCol Heffner was changing into his dress uniform, in a changing room located next to LtCol Kidd's office, where LtCol Kidd was working at his desk.

The appellant walked into LtCol Kidd's office, pulled out his pistol, asked him, "Remember me, f——er?" and then shot the XO as he tried to exit the office through the door into the changing room. The bullet entered the right side of his lower back, exited the right front side of his abdomen, and then amputated his right ring finger. LtCol Kidd managed to stagger into the changing room, with the appellant close behind him.

LtCol Heffner was changing uniforms when the door to the changing room burst open and LtCol Kidd rushed in. LtCol Heffner first glanced at his XO, and then noticed the appellant in the doorway. The appellant raised his pistol and shot LtCol Heffner in the chest, at which point LtCol Heffner ran out of the office suite. The appellant then shot LtCol Kidd again, the bullet entering his upper back. LtCol Kidd collapsed to the floor and bled to death within a matter of minutes.

After the third and fatal shot was fired, the appellant left the office suite and followed the bloody trail left by LtCol Heffner. As he moved down the passageway, he confronted Gunnery Sergeant (GySgt) W.J. Till and Staff Sergeant (SSgt) A.L. Karr. The appellant pointed the pistol at both Marines but did not fire.

By this time, LtCol Heffner was lying just outside one of the ground floor entrances to the building. Various Marines were providing first aid to their CO. GySgt W.E. Tiller was there and heard someone ask where the XO was. He then went up to the second floor to find the XO. As he proceeded down the passageway toward the command office suite, he saw the appellant a few feet away. GySgt Tiller stepped toward the appellant and reached for the gun. The appellant raised the gun toward GySgt Tiller and fired. GySgt Tiller avoided the shot and struggled with the appellant, eventually disarming him.

The appellant broke away from GySgt Tiller and went down the stairs to the ground floor to the Production Control Office. A number of senior enlisted Marines were in the office at the time. When the appellant entered the office, none of them knew what had just happened. The appellant said, "Gunnery Sergeant, apprehend me, I just shot the CO and XO," or words to that effect. GySgt P.T. Sullivan asked the appellant to sit down, and he did so.

Soon other Marines entered the office. The appellant talked about why he shot the CO and XO, complaining that he wasn't treated well in the squadron and that he did it for his "brown brothers," or words to that effect. At one point, the appellant stood up, pulled down his coveralls, took off his undershirt, and displayed the tattoos that covered his upper body. One of the large tattoos read "Sureno," which the Government argued was a reference to Southern California gangs. Shortly thereafter, a military policeman arrived and took the appellant into custody.

## II. Factual and Legal Sufficiency of the Evidence

Four of the assignments of error assert that the evidence is insufficient to sustain various findings of guilty, including the finding of guilty to premeditated murder of LtCol Kidd. Before we address the challenges for cause and other issues, we will resolve these four assignments of error to ensure that a rehearing will not violate the appellant's right against double jeopardy. See Arts. 44(b) and 66(d), UCMJ, 10 U.S.C. §§ 844(b) and 866(d). We will also perform our statutory duty to determine whether the evidence is sufficient as to every other offense of which the appellant stands convicted. See Art. 66(c), UCMJ.

This court's standard of review for sufficiency of the evidence is set forth in Art. 66(c), UCMJ:

In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

Further, this standard and its application have been recognized and defined by the Court of Appeals for the Armed Forces:

[U]nder Article 66(c) of the Uniform Code, 10 U.S.C. § 866(c), the Court of [Criminal Appeals] has the duty of determining not only the legal sufficiency of the evidence but also its factual sufficiency. The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560[ ] (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987).

We conclude that a reasonable factfinder could properly have found, beyond a reasonable doubt, that the appellant committed each of the offenses of which he stands convicted. Moreover, after careful consideration, we are convinced beyond a reasonable doubt that the appellant committed each of those same offenses.

### III. Challenges for Cause

Following voir dire, the trial counsel challenged two members of the court-martial panel, LtCol C.W. D'Ambra, USMC, and Master Sergeant (MSgt) R.T. Buckham III, USMC, for cause, citing their religious faith and reliance on prayer in deliberating on a potential death penalty. The military judge granted both challenges for cause, opining that "based on their strongly held religious beliefs they will have difficulty in considering the entire range of punishments in this case." Record at 1527. The appellant contends that the military judge committed reversible error by granting the Government's challenges for cause. We disagree as to LtCol D'Ambra. We agree as to MSgt Buckham.

### A. BACKGROUND

To set the scene for our discussion of these challenges for cause and the ruling of the military judge, we will quote extensively from the record. The parties conducted thorough and probing individual voir dire of these members. We will begin with pertinent extracts from the colloquy with LtCol D'Ambra:

TC: Let me rephrase it, sir. If the government meets all of its burdens in this case, ... can you seriously consider the death penalty in this case?

MBR: I can consider it.

. . . .

Q: Do you have any strong feelings—and, again, I'm going back to your questionnaire when you say "mixed." Do you have any leanings one way or another that you feel will give you trouble considering the death penalty?

A: Well, I am not sure, Jake, what you're driving at. Basically it would be religious—for religious reasons, whether I am—I just can't make that decision at this time over something I was afraid of whether I could actually vote for a death penalty. I mean, I certainly feel that it is justified but it's the other side that contradicts whether it is ever warranted.

. . . .

Q: Sir, I notice from your questionnaire you are—you're a practicing Catholic.

A: Yes.

Q: Is there anything about that, your religion, that will prevent you from seriously considering the death penalty should the

government, again, meet all of its burdens in this case?

A: Well, as far as I know the Catholic church does—is against the death penalty. But, again, it all goes to a conscious decisions [sic] I'll have to make and it's just something that I'll have to wait and consider.

Q: Will you have difficulty considering the death penalty, should the government meet all of its burdens, because of your religion?

A: I don't know if I'll have difficulty but it's going to be something that I'll have to wrestle with, yes.

Record at 1209–11. The trial defense counsel followed up with additional questions. LtCol D'Ambra confirmed that he would consider the death penalty and not rule it out. However, the defense never fully rehabilitated this member regarding his misgivings about the death penalty.

We now turn to MSgt Buckham. Extracts from his individual voir dire follow:

TC: I want to talk to you just a little bit about your religious convictions. I notice either you are a deacon or you were selected as a deacon. Is that correct?

MBR: At that time I was nominated or—nominated as a deacon and now I'm currently serving as a deacon in our church.

Q: Okay. And that's a Baptist church?

A: Yes, sir.

Q: What type of Baptist? American Southern Baptist?

A: We're—it's—we're part of the Baptist General Conference.

. . . .

Q: Now, do you know what the church's stand or what their plank is on the death penalty?

A: Our—to the best of my knowledge, our church has no official position.

Q: Have you ever discussed that in church or discussed that in some Bible studies, stuff like that, conversations like that, the death penalty?

A: Not that I recall, sir.

. . . .

Q: Okay. Describe for me generally the death penalty in the biblical context.

A: Well, sir, I certainly haven't formed a conviction of what the Bible says about the death penalty . . .

Record at 1391–92. The trial counsel and MSgt Buckham then discussed in great detail Biblical teachings on the death penalty, focusing on the account in the New Testament of the woman taken in adultery and presented to Jesus for judgment. *See John* 8:2–11. The colloquy continued:

Q: Do you think from that parable of the Bible and that story that Christ has forbidden you, if you believe in Christianity from voting for the death penalty?

A: I don't believe that is particularly something that would go into building a conviction about the death penalty.

Q: Is there—

A: Not—I do not—I don't believe that that prohibits me from thinking that the death penalty is a valid action.

Q: Okay. I got the impression there was something else that you were going the [sic] say. Is there maybe something else there that would prohibit you from considering that?

A: No, sir.

Q: Nothing else in the New Testament? Anything else in the Bible that you think makes you kind of sit back and say, you know, I'm not sure we should be doing this?

A: No, sir. I believe the death penalty is a not often used means of—of—of a penalty, that if—if warranted, is just. And I also think it is a—is a factor in society that would prohibit others from doing like crimes.

Q: Let me ask you this: As a Christian, do you pray about important decisions?

A: Yes, sir.

Q: Significant decisions, you seek direction from God?

A: Yes, sir.

ADC: Sir, objection. At this point, I think we're getting way too personal with the Top. These are personal convictions that don't need to be aired in this courtroom.

MJ: Sustained. Let's move on.

ATC: Generally, sir—I'll back off from that. But the one question I wanted to get to, sir, was whether in this case the Master Sergeant felt that when he voted for death or not to vote for death, whether he would consider that a decision he would need to pray about.

MJ: All right. You can ask that question.

Voir dire by the prosecution (continued):

Q: Does that question kind of make sense to you, Master Sergeant?

A: Sir, would you ask the question again, please.

Q: When you go back in that deliberation room and you're all talking about—if we ever get to that point, okay, and you are deciding whether to vote for the death penalty for Sergeant Quintanilla or vote against the death penalty, is that a decision that you feel that is one of those important decisions that we just talked about that you would actually pray about and seek direction from God about?

A: Sir, my—my aim is to live my life in prayer through the meditation of God's word and the application of that word on a daily, even hourly basis. So in answer to that question, yes, I would make it a matter of prayer.

Q: I'm certainly not trying to give you the impression that you shouldn't do that at all.

A: Understood, sir.

Record at 1394–95. The defense followed up on the same theme:

ADC: Top, I take it from your discussion from Captain Feldman that you possess a great personal faith and that faith is a very high priority in your life; correct?

A: That's correct, sir.

Q: And when asked about would you weigh this—would you have to pray about this decision, I take it from the way you live your life you pray about all weighty decisions and that's a part of who you are. Fair enough?

A: Yes, sir.

. . . .

Q: And if Lieutenant Colonel Blanche tells you how this case shapes up, if the death penalty is a valid and authorized penalty, then you have to be able to consider that and be able to possibly do that. Are you able to do that, Top?

A: To consider what the judge—

Q: Right. Exactly. If Colonel Blanche tells you that the death penalty may be authorized in this case, and this [is] an authorized punishment, you have to be able to consider using the death penalty or ordering the death penalty. Can you do that?

A: Yes, I can, sir.

Record at 1396–97.

Following individual voir dire of other members, the court-martial recessed for 46 minutes. The Government then offered its challenges for cause:

TC: Sir, we would challenge Lieutenant Colonel D'Ambra.

MJ: Let me hear your basis for him first.

TC: Yes, sir. Our basis would be in his discussion about his religious faith and that he would need to pray about his decision in regard to the death penalty. It's an obvious notation that he's a practicing Catholic and the Catholic churches oppose to [sic] the death penalty.

We believe that would certainly leave the impression that he could not seriously consider that—the fact—I think it works both ways in this case. The fact if he's praying about this decision or feels his religious decision is that, in fact, he should give the death penalty or shouldn't give it, that's not going to be based on the evidence presented in this case but on a more personal side of the house in his prayer life, I guess is better words.

MJ: Okay. Defense, do you oppose this challenge for cause?

IMC: Yes, sir, we do. Lieutenant Colonel D'Ambra states that he can consider the death penalty. He thinks it does have a place in our society. Simply by the fact that he may need to pray over a big decision shouldn't excuse him, sir. We take that into court when we make our decisions. Members take their real life experi-

ence and use that to make their decisions. He clearly could consider in that.

MJ: Government, your next challenge for cause, if any?

TC: Master Sergeant Buckham. Again, same similar issues on that one, sir. Again, he discusses about seeking guidance from God, praying about that decision.

I would also note for the record his very emotional response when faced with that, his eyes watering up, serious consideration and delay in responding to those questions. It obviously shows a very concerned attitude over that issue. If, in fact, he's that emotionally distraught with the voir dire process, imagine when we're at sentencing, even as Captain Bellon described the magnitude of victim impact evidence and controlling those emotions. If he's having a difficult time at this point certainly when we're at that stage of the trial he's going to be faced with that same or similar difficulty.

MJ: All right. Response.

IMC: We object to that, sir. It's not a basis for a challenge for cause. He states he feels the death penalty is a deterrent. He's not prohibited from imposing the death penalty by any religious beliefs. There's nothing in his biblical studies that would restrict him from imposing the death penalty. He could consider it. Simply because he's emotional and he may pray about something, the same arguments before with the Lieutenant Colonel, sir. You shouldn't excuse him. It's not a basis for any challenge for cause.

MJ: Well Captain Mulcahy, what about his visual demeanor in court when posed that question?

IMC: Sir, there's no substantial doubt as to if he's sitting on the court as a member as to legality, fairness and impartiality, and that's what R.C.M. 912 says as a basis for a challenge. He simply was somewhat emotional realizing it's going to be an important decision but in no way—no which prohibit him and it's not a basis for a challenge, sir.

MJ: Are you—you are not challenging the fact that he did have a visual reaction to that particular question then; correct?

IMC: We're not sure why he had that particular reaction, sir. Sir, there really isn't any evidence of why he had the reaction he was. Possibly it was from Captain Bellon's [sic] questions or confrontations. We're not sure what started him on his reaction, sir.

MJ: Okay. Trial counsel, your next challenge, if any?

Record at 1520–22. After hearing all challenges for cause from both sides, the military judge took a recess to consider them. He then ruled as follows:

> The challenges for cause against Lieutenant Colonel D'Ambra ... Major [sic] Buckman [sic] ... are all granted.

> Based on the guidelines of R.C.M. 912(f)(1)(N), it is my mandate as military judge to ensure that this court-marital [sic] be free from substantial doubt as to fairness and impartiality of the members. Applying this guidance based on the responses by Lieutenant Colonel D'Ambra and Master Sergeant Buckman [sic]—and Master Sergeant Buckman's [sic], *the court opines that based on their strongly held religious beliefs they will have difficulty in considering the entire range of punishments in this case.*

Record at 1527 (emphasis added).

### B. STANDARD OF REVIEW

Normally, "a military judge's ruling on a challenge for cause is given 'great deference'." *United States v. Rolle*, 53 M.J. 187, 191 (C.A.A.F.2000)(quoting *United States v. Rome*, 47 M.J. 467, 469 (C.A.A.F.1998)). However, in a capital case, we are reminded that "death is qualitatively different." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)(Stewart, J., plurality opinion). For that reason, while we accord the military judge deference in our review of his rulings on challenges for cause, we are not willing to allow him "great" deference in this capital case. *See United States v. Gonzalez–Balderas*, 11 F.3d 1218, 1222 (5th Cir.1994)("removal of a potential juror on the basis of opposition to the death penalty is subject to heightened scrutiny")(citing

*United States v. Prati,* 861 F.2d 82 (5th Cir.1988)).

As stated in the most recent capital case-opinion issued by our superior court, a military judge's ruling on a challenge for cause is reviewed for an abuse of discretion. *United States v. Gray,* 51 M.J. 1, 32 (C.A.A.F.1999). We will reverse for an abuse of discretion "if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Sullivan,* 42 M.J. 360, 363 (C.A.A.F.1995)(citing S. Childress & M. Davis, 2 FEDERAL STANDARDS OF REVIEW § 11.10 (2d ed.1992)).

## C. DISCUSSION

■ Jurors may not be removed simply because they express "conscientious or religious scruples" against the death penalty. *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The test for removal of a court-martial member based on opposition to the death penalty is "whether the [member]'s views would 'prevent or substantially impair the performance of his duties as a [member] in accordance with his instructions and his oath.'" *Gray v. Mississippi,* 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)(quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)); *Gray,* 51 M.J. at 32.

We now turn to the military judge's ruling on the challenges against LtCol D'Ambra and MSgt Buckham. His rationale in granting both of these challenges was that the members would have difficulty considering the full range of possible punishments because of their strongly held religious beliefs. Although his reference to the "entire range of punishments" presumably included restriction, reduction in rate, reprimand, etc., nothing in the voir dire of these members alluded to any punishment other than death. Thus, we conclude that the military judge's reference to all possible punishments was merely a euphemism for the death penalty. We are left, then, with his finding of fact that their strongly held religious beliefs would be a substantial influence, in some degree, in their consideration of the death penalty, should capital sentencing become an option.

■ As to LtCol D'Ambra, the military judge's finding was not clearly erroneous. This member explained that he was a Catholic and that he understood his faith to disapprove of the death penalty. He went on to say that, for religious reasons, he was not sure he could vote for the death penalty. In fact, he said that, owing to his religious beliefs, he would have to wrestle with a potential death penalty. The trial counsel cited those beliefs in support of his challenge, but erroneously argued that LtCol D'Ambra would have to pray about his decision and place undue reliance on divine guidance in his deliberations. In fact, LtCol D'Ambra said nothing about prayer. Apparently, the trial counsel confused LtCol D'Ambra's responses with MSgt Buckham's statements about prayer. Unfortunately, the individual military counsel did not correct the trial counsel's misstatement. The military judge correctly noted LtCol D'Ambra's religious qualms about the death penalty in his ruling and said nothing about whether LtCol D'Ambra would pray about his vote on sentencing. In sum, the military judge accurately described LtCol D'Ambra's responses during the individual voir dire.

■ However, we are not so confident about the military judge's articulation of the legal test for granting the challenge against LtCol D'Ambra. The military judge found that he would have "difficulty in considering the entire range of punishments in this case." Record at 1527. That is not the correct test. We expect that many, if not most, conscientious members in a capital case would have some difficulty in voting to condemn a fellow Marine to die. Rather, the test is "whether the [member]'s views would 'prevent or substantially impair the performance of his duties as a [member] in accordance with his instructions and his oath.'" *Gray,* 481 U.S. at 658, 107 S.Ct. 2045 (quoting *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844); *Gray,* 51 M.J. at 32. If LtCol D'Ambra's responses had not so clearly indicated his failure to pass the correct legal test, although not correctly articulated by the military judge, we would have difficulty deferring to his decision. However, since LtCol D'Ambra's religious views clearly would have prevented or

substantially impaired his ability to consider and vote for the death penalty, we conclude that the military judge did not abuse his discretion in granting the challenge for cause.

MSgt Buckham is another matter. As to this member, the military judge not only misstated the legal test, he clearly erred in his finding of fact. MSgt Buckham never said, nor even intimated, that he would have difficulty considering the death penalty. Rather, he explained that he considered it to be a just punishment that would tend to deter others from committing murder. He specifically disavowed any opinion that the Bible or his church took a position on the death penalty. While he candidly stated that he would pray about imposing the death penalty, nothing in his responses indicated that prayerful consideration of divine guidance would prevent him from following the instructions of the military judge or abiding by his oath.[3] Finally, MSgt Buckham indicated, without equivocation or reservation, that he could consider imposing the death penalty.

Contrary to the foregoing responses, the military judge found that "based on ... strongly held religious beliefs [MSgt Buckham would] have difficulty in considering the entire range of punishments." *Id.* at 1527. This finding is clearly erroneous. MSgt Buckham never expressed any strongly held religious beliefs on the death penalty. Moreover, he never indicated any difficulty considering the death penalty.

In oral argument, the Government emphasized one statement in MSgt Buckham's questionnaire. In response to a question about his general feelings concerning the death penalty, MSgt Buckham wrote:

Generally that the death penalty's use by a court is the ultimate expression of divine sovereignty through human instruments of justice. That to a people who know not this divine sovereign and do not understand their use as an instrument of his judgement [so] that the death penalty is not effective. It is not effective because it

is not enforced and it may not be administered justly.

Appellate Exhibit CXIII at 422. The Government contends that this statement casts substantial doubt about his ability to consider the death penalty. We disagree. First, we find that the questionnaire comment is unclear as to its meaning and import. Second, any qualms expressed in the comment were certainly clarified and refuted during the extensive individual voir dire. It is particularly noteworthy that the Government did not bother to question MSgt Buckham about the questionnaire comment during the voir dire, nor did the Government challenge him on that basis, thus indicating no particular concern about the import of that comment.

In oral argument, the Government also made much of MSgt Buckham's in-court demeanor during the individual voir dire, arguing that his "very emotional response" to questions about the death penalty showed that the member could not truly consider that punishment. Record at 1521. The trial counsel described his demeanor as "his eyes watering up, serious consideration and delay in responding to those questions." *Id.* When pressed by the military judge, the trial defense counsel observed that there was no evidence explaining the motive or basis for the emotional reaction and opined that it may have stemmed from "[trial counsel's] questions or confrontations." *Id.* at 1522. We note that neither counsel nor the military judge chose to call the member back in for additional questioning to clarify the basis for his emotional demeanor.

We need not speculate regarding MSgt Buckham's emotional demeanor because he has explained it in an affidavit attached to the Petition for New Trial. In pertinent part, we now quote from the affidavit:

8. The emotional responses that the military judge, trial counsel and defense counsel alluded to on the part of affiant had nothing to do with affiant's feelings about the death penalty, but instead were a *direct result of the emotional climate that*

---

3. We decline to resolve the constitutional issues discussed in the *amici curiae* brief regarding religion and selection of court-martial members. Suffice it to say that we are unaware of any rule of law that renders religious affiliation, belief, or practice *per se* incompatible with a member's oath or affirmation.

*was set in the courtroom by the probing, invasive and personal questioning by trial counsel* of affiant concerning affiant's religious beliefs.

9. Affiant questioned then and now the intent of the trial counsel in asking the types of questions that he was asking and the "digging" manner in which they were being asked.

10. Affiant sensed that trial counsel was attempting to imply that affiant's religious beliefs would somehow delay the court-martial and the members' deliberations because affiant would have to stop the proceedings to pray about any decision that he would have to make.

11. Affiant did respond emotionally to trial counsel's implied assertion that affiant's religious beliefs would impede his ability to sit as a member of a court-martial to which affiant had been detailed *and for no other reason.*

MSgt Buckham Affidavit of 19 Feb 1999 (emphasis added). There being no reason to question this sworn statement, we accept it as a perfectly understandable and rational explanation of his emotional demeanor, particularly in view of the prosecutorial tactics employed in this court-martial, as discussed below. Moreover, if the military judge did consider MSgt Buckham's emotional demeanor in deciding the challenge, we note that the military judge did not cite it as a basis for his ruling. Thus, we conclude that MSgt Buckham's emotions had nothing to do with his views regarding the death penalty.

■ Having concluded that the military judge abused his discretion in granting the Government's challenge against MSgt Buckham, we now consider the extent of the prejudice and the appropriate remedy. The appellant argues that "[t]he correct remedy for the improper exclusion of a member in a contested case is to set aside the findings and sentence while authorizing a rehearing." Appellant's Brief of 12 Aug 2003 at 35 (citations omitted). Because the brief supports this argument in such a clear and succinct manner, we quote from it:

The improper exclusion of a member is particularly harmful in a military capital case, where a death sentence requires three unanimous votes, one during the findings stage and two during the sentencing stage, after which every member still retains the complete discretion to reject the death sentence. Thus, the improperly-granted challenge had the practical consequence of ceding a vote to the government at each of the four death penalty gates. . . .

We will never know [how the voting might have been different] because the military judge erroneously excluded MSgt Buckham from the panel. Accordingly, Sgt Quintanilla must be retried before a properly selected panel.

Appellant's Brief at 35–36 (internal citations omitted).

The Government argues that "the proper remedy would be to simply disapprove the death penalty aspect of Appellant's sentence and approve the lesser sentence of life without parole." Government Brief of 11 Mar 2004 at 51–52. The Government relies on *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), where the United States Supreme Court held that where one prospective juror was improperly excluded by the trial court due to qualms about the death penalty, the findings of guilty would be affirmed but the death sentence would be set aside. One year later, the Supreme Court clarified *Adams,* by holding that, in such a scenario, harmless error analysis cannot apply and that reversal as to the death sentence is automatic. *Gray,* 481 U.S. at 667–68, 107 S.Ct. 2045. We note that, as in *Adams,* the Court declined to set aside the findings of guilty.

We are persuaded by the appellant's argument and by military case law set forth after these United States Supreme Court decisions. In *United States v. Giles,* 48 M.J. 60 (C.A.A.F.1998), the appellant pleaded not guilty to various drug charges. Following voir dire, the defense counsel challenged a member for cause based on an inelastic attitude about the imposition of a punitive discharge. The military judge denied the challenge. The defense counsel properly preserved the issue by stating that he would have used his peremptory challenge against a different member if the challenge for cause had been granted. On ap-

peal, the Court of Appeals for the Armed Forces held that the military judge abused his discretion. Despite the fact that the issue went solely to sentencing, our superior court set aside the findings as well as the sentence, without elaboration. *See United States v. Greene*, 36 M.J. 274, 282 (C.M.A.1993)(setting aside findings and sentence where military judge erred by granting prosecution's peremptory challenge without offering race-neutral reason); *but see United States v. Jobson*, 31 M.J. 117, 120–21 (C.M.A.1990)(holding if a military judge erred in denying a defense challenge for cause against a member who knew of the pretrial agreement, the appellant would be entitled to a rehearing on sentence).

This court followed *Giles* and set aside the findings and sentence in *United States v. Pritchett*, 48 M.J. 609 (N.M.Ct.Crim.App. 1998). *Pritchett* was another contested non-capital case before members where we concluded that the military judge committed prejudicial error by denying the appellant his statutory right to a peremptory challenge against new members. After holding that such an error would be presumed prejudicial, we reasoned that under the facts in that case, the presumption had not been rebutted. Our reasoning included this salient comment: " 'The reason prejudice is presumed from such an error of law is that this Court has no way to determine how the ineligible member voted or whether his vote may have controlled the sentence imposed by the court.' " *Pritchett*, 48 M.J. at 613 (quoting *United States v. Lenoir*, 13 M.J. 452, 453 (C.M.A. 1982)).

If this reasoning applies to errors in rulings on member challenges in non-capital cases, we think it applies with greater force and effect in a capital case such as this, where the appellant's life might be spared on any of three or four different votes taken during the findings and the sentencing phases of trial. Since the military judge erroneously permitted the Government to remove MSgt Buckham, as the appellant argues so persuasively, we will never know if any of those votes might have been different. We hold that military due process requires us to set aside the findings as well as the sentence.

## IV. Prosecutorial Misconduct

In two assignments of error and the supplemental assignment of error, the appellant asserts that, because of prosecutorial misconduct, the findings and sentence must be set aside. While we strongly disapprove of the actions of the trial counsel and assistant trial counsel, we conclude that the appellant was not prejudiced. Even though we set aside the findings and sentence on another ground, we discuss prosecutorial misconduct to discourage any repetition of these actions in a rehearing.

The first incident occurred before the trial commenced and involved an *ex parte* communication. Following the Article 32, UCMJ, investigation, the assistant trial counsel, Major (Maj) G.P. Glazier, USMC, had a brief conversation about the case with the Article 32 Investigation Officer (IO) outside the presence of any defense counsel in this case.

█ Prosecutorial misconduct consists of " 'action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon.' " *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F.2003)(quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F.1996)). In evaluating an assertion of prosecutorial misconduct, we focus on the "overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." *Thompkins*, 58 M.J. at 47 (citing *Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). If the prosecutor violated some legal norm, and if that violation impacted on some substantial right of the appellant, we must still consider the record as a whole to determine whether the violation was harmless under all the circumstances of a particular case. *Meek*, 44 M.J. at 5.

This incident comes to our attention as an *ex parte* communication by a prosecutor. An *ex parte* communication is one "[d]one or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested." BLACK'S LAW DICTIONARY 597 (7th ed.1999). As set forth by the Judge Advocate General of the Navy, the rule against *ex*

*parte* communications prohibits Navy and Marine Corps judge advocates serving as trial counsel (prosecutors) and defense counsel from taking the following actions:

(1) seek to influence a judge, court member, member of a tribunal, prospective court member or member of a tribunal, or other official by means prohibited by law or regulation; [or]

(2) communicate ex parte with such a person except as permitted by law or regulation;

. . . .

■ Judge Advocate General Instruction 5803.1A, Rule 3.5a (13 Jul 1992). Thus, the general rule is that an advocate cannot communicate with a judge or "other official," such as an IO, in a court-martial about a particular case in the absence of opposing counsel or without advance notice to, and consent of, that opposing counsel. Even when opposing counsel has been notified, such communications should be restricted to administrative matters that have no bearing on the substantive issues of the case.

■ Our superior court has held that an Article 32, UCMJ investigation is a "judicial proceeding" in which "ex parte communications between the investigating officer and the prosecution are improper." *United States v. Holt*, 52 M.J. 173, 183 (C.A.A.F.1999)(citing *United States v. Argo*, 46 M.J. 454, 458 (C.A.A.F 1997)). Based on our review of the record, we concur with the military judge's conclusion that Maj Glazier's brief conversation with the IO was "ill advised" and certainly gave rise to an "appearance of impropriety." Record at 869–70. However, we also conclude that this conversation did not just *appear* to be improper, it was improper. There was no lawful reason for Maj Glazier to communicate with the IO about the investigation, particularly when all the evidence had been taken and the IO would next be considering the evidence and making his recommendations. Nonetheless, we hold that the conversation had no impact on the IO's report or recommendations or on the eventual trial in this case. Based on our review of the record, we are confident that the appellant was no worse off because of Maj Glazier's behavior than if Maj Glazier

had conducted himself in accordance with the law and applicable ethical canons. Accordingly, the appellant is not entitled to relief on this ground.

Unfortunately, this was not the only prosecution misstep in this capital case. Because of the nature and number of such missteps, some of which are detailed in the Supplemental Assignment of Error and the Petition for New Trial, we feel compelled to discuss some of them.

■ The first is the trial counsel's argument on a motion as to which he also offered testimony. The trial counsel in this case was Captain (Capt) C.E. Feldman, USMC. To understand the issue, we first summarize the background. Hours after the shootings, the appellant was detained in the brig in pretrial confinement. A hearing was held to determine whether legal grounds existed to continue that pretrial confinement or whether the appellant should be released from that status. Capt Feldman represented the Government and the unit at this hearing. Capt D.G. Bellon, USMC, represented the appellant. Those in attendance included five or six representatives from the media, including at least one local television station. The prosecution team had no prior knowledge that media representatives would be present for the hearing. During the hearing, Capt Feldman presented witness statements to justify continued pretrial confinement. He did so by delivering copies to the Initial Review Officer (IRO) and to Capt Bellon, then reading aloud from the statements. The defense objected to the reading from the documents in front of the media, fearing that the media would publish the substance of the statements and potentially taint the pool of potential members in the Camp Pendleton area. The hearing officer asked Capt Feldman to stop reading, which he did. Nevertheless, as the defense feared, media representatives did publish the substance of the statements. Later, during voir dire, every member revealed that he/she had been exposed to media accounts of the shootings and investigation, although it was not clear whether the members had read or seen media accounts of this particular hearing.

Based on this and other actions by the prosecution team, the defense filed a pretrial motion to dismiss all charges based on prosecutorial misconduct. Among other evidence, Capt Feldman testified for the Government regarding his participation in the pretrial magistrate's hearing. Following direct examination, he was cross-examined on that issue. He later presented argument on the same motion addressing, in part, his own testimony. Thus, Capt Feldman both testified and argued on a contested issue. We note that in making that argument, he specifically addressed his own testimony and the propriety of his own actions.

In doing so, Capt Feldman violated the ethical rule against attorneys acting as an advocate and witness in the same matter. JAGINST 5803.1A, Rule 3.7(a) (13 Jul 1992).[4] The only arguable exception to that rule in this case applies for testimony regarding "the nature and quality of legal services rendered in the case." *Id.* However, although his testimony on the issue was certainly appropriate, there was no need for him to make argument on that testimony, particularly where two other prosecutors were available to present the argument. We note that the defense team did not object to this ethical violation, apparently concluding that no prejudice occurred. Based on our review of the record, we concur that no prejudice occurred, but do not condone yet another example where a prosecutor ran out of his lane.

■ The next, and most egregious, incident that merits discussion is Maj Glazier's unauthorized withholding of evidence from the evidence custodian. Without exploring all the details, suffice it to say that a Naval Criminal Investigative Service (NCIS) report attached to the Petition for New Trial demonstrates to our satisfaction that:

1. Following the adjournment of this court-martial, Maj Glazier and Capt Feldman gave the bullet that pierced LtCol Heffner's chest to him. This was done at the request of LtCol Heffner.

2. Maj Glazier gave the ring LtCol Kidd was wearing at the time of his murder to his widow, Mrs. Kidd.

3. Maj Glazier kept a knife seized from the appellant for himself.

4. Maj Glazier withheld the pistol used by the appellant in the shootings. Capt Feldman later received the pistol, mounted it on a plaque, and hung it in his office, where he served as a Deputy District Attorney in Steamboat Springs, Colorado. The plaque was engraved as follows: Capt Charles Feldman and Maj Guy Glazier, Sureno Busters.

5. Neither Maj Glazier nor Capt Feldman had any permission or authority for their actions.

6. During the investigation, each of the items were returned to the Naval Criminal Investigative Service.

It goes without saying that it is highly unethical, if not illegal, for prosecutors to take or withhold evidence, without authority, in a court-martial, and convert it to their personal use or that of others. *See* JAGINST 5803.1A at Rule 8.4. This is particularly true in the military justice system where a conviction is inchoate until the convening authority takes his action on the case, and not final until this court completes its review under Articles 59(a) and 66(c), UCMJ. Moreover, in a capital case such as this, review by our superior court is mandatory. Art. 67(a), UCMJ, 10 U.S.C. § 867(a). Thus, evidence admitted at trial must be preserved under established evidence custody rules until such time that appellate review is final.

■ We rebuke Maj Glazier and Capt Feldman for their actions and trust that no Navy or Marine Corps prosecutor will follow their bad example. Testing for prejudice, we conclude that the prosecutors' post-trial actions had no impact on the findings and sentence.

We cite one last example of questionable prosecutorial conduct that occurred during Maj Glazier's sentencing argument. Maj Glazier described the incident at a presenta-

---

**4.** As noted above, our judicial duties require us to determine if a prosecutor's conduct violates any ethical canon. Our judicial determination does not usurp the province of the Judge Advocate General under the Instruction to decide whether sanctions would be appropriate for the same conduct. *See* JAGINST 5803.1A, Encl.2 (13 Jul 1992).

tion he made to the Government Capital Litigation Course at the Naval Justice School in March and May of 1997:

> And I'm getting louder and louder and louder and the members who are starting to go to sleep on me are saying, "Boy, this is really building. What is he getting to?" And then I get down to my objectionable stuff, you know, you're getting louder and I'm moving and I'm moving around the courtroom too. I'm up in front of the members when I'm starting my closing argument and I'm loud and I'm in their face but I'm not near the accused, I'm up with the members. And then I'm backing off, I'm softer and I'm softer and I'm talking about the victims and the impact on them and I'm getting further away from the jury. It's hard for them to hear me. They're straining to listen. *I get over, I actually take a seat on the witness stand, which is highly objectionable, and I start talking about what Colonel Kidd would have testified to if I could have called him as a witness.* And then, as I'm building this crescendo, I get off the witness stand and I go over to the accused ... and I start talking about, you know, "We do remember you. Gentlem[e]n, answer that question." And by the time I get down to the bottom, *I'm screaming, I'm right in the accused'[s] face and I'm pointing at him, "You're that gang banging, murdering animal who literally tore the heart out of a man.* Tore the heart out of a family. Tore the heart out of the squadron. Tore the heart out of the eagle on that flag over there. We remember you, by God, we remember you."

Appellant's Motion to Attach of 19 Apr 2001, Glazier Transcript IV of 29 May 1997 at 45–46 (emphasis added). Maj Glazier's description is corroborated by the record and by a post-trial clemency request. Record at 3032–33; LtCol G.S. Barthel ltr of 10 Feb 98 at ¶ 14.

As Maj Glazier observed, his sentencing argument was highly objectionable, violating various ethical canons. The American Bar Association Standards for Criminal Justice state that "the prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to codes of professionalism and by manifesting a professional attitude toward the judge, opposing counsel, witnesses, defendants, jurors, and others in the courtroom." Prosecution Function Standard 3–5.2(a). In other words, Maj Glazier's overbearing, intemperate, and deliberate conduct and language improperly tended to inflame the passions and possible prejudices of the members and placed the fairness of the sentencing proceedings in jeopardy. *See United States v. Barrazamartinez,* 58 M.J. 173, 176 (C.A.A.F.2003); Prosecution Function Standard 3–5.8(c).

The ADC made a timely objection to Maj Glazier's entire sentencing argument, focusing on the words used, namely "bad hombre," "animal" (three times), "gang-banging" (twice) and drive-by shooting (twice). The military judge sustained the objection and gave a curative instruction. The members stated they understood the instruction and agreed to follow it. Presuming that the members did indeed follow the instruction in their deliberations, we conclude that these references had no impact on the sentence. *See United States v. Garrett,* 24 M.J. 413, 418 (C.M.A.1987). Nonetheless, Maj Glazier's argument was an affront to principles of justice and fair play.

We do not begrudge an advocate's effort to influence the members and the military judge to accept his/her arguments on the facts and the law. That is what advocates are expected to do. *See Barrazamartinez,* 58 at 176 (C.A.A.F.2003)(citing *United States v. Nelson,* 1 M.J. 235, 238 (C.M.A.1975)). In fact, it is beyond cavil that prosecutors and defense counsel should be zealous in their advocacy. But, such zealous advocacy must be kept within the bounds of law, military regulation and ethical rules.

> The qualities of a good prosecutor are as elusive and as impossible to define as those which mark a gentleman. And those who need to be told would not understand it anyway. A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the

law and not factional purposes, and who approaches his task with humility.

United States Att'y Gen. Robert H. Jackson, Address at the Second Annual Conference of United States Attorneys at 4–5 (Apr. 1, 1940).

We understand that the facts of this case cry out for justice for the appellant's heinous crimes, particularly as to LtCol Kidd and LtCol Heffner. We also understand the zeal displayed by Maj Glazier and Capt Feldman throughout this court-martial. But there is a line between zealous prosecution infused with righteous indignation, on the one hand, and unethical conduct, on the other. These two judge advocates crossed that line on several occasions in this capital court-martial. In so doing, they jeopardized the integrity of the trial proceedings and besmirched the military justice system in the United States Marine Corps.

## V. Sequestration of Witnesses

■ In a motion for summary disposition and in the first assignment of error, the appellant asserts that the military judge committed reversible error by allowing three of the victims' family members who testified in sentencing to observe the entire trial from the spectator gallery. We agree that the military judge committed error, but hold that it did not prejudice the appellant. *See United States v. Spann*, 51 M.J. 89, 93 (C.A.A.F. 1999).

## VI. Appellate Delay

The appellant asserts that combining the death penalty with the extended period of confinement already served is cruel and unusual punishment. Citing no binding federal or state authority, he argues that this combination produces great mental anxiety and suffering that violates the Eighth Amendment and Art. 55, UCMJ, 10 U.S.C. § 855. We disagree, but the length of appellate delay itself warrants discussion.

The appellant was sentenced on 5 December 1996, the convening authority took his action on 29 July 1998, and the case was docketed at this court on 5 October 1998. The appellant's brief was not filed until 13 June 2003, nearly five years later. All briefs

were filed and the case was placed in panel for decision on 15 April 2004. We heard oral argument on 13 October 2004. The record of trial in this capital case includes 3091 pages and hundreds of prosecution, defense, and appellate exhibits. The various appellate briefs and other substantive filings number hundreds of pages. The appellant's brief and assignments of error alone numbers 408 pages.

In a civilian capital case, the appellant may relieve himself of any anxiety and suffering stemming from the combination of a death sentence and unpredictable periods of posttrial delay by simply declining to file appeals. *See Foster v. Florida*, 537 U.S. 990, 991, 123 S.Ct. 470, 154 L.Ed.2d 359 (2002)(Thomas, J., concurring). However, as the appellant correctly argues in his brief, a military capital appellant cannot avoid appellate review of his sentence. Waiver or withdrawal of appellate review in a military capital case is not an option. Art. 61, UCMJ, 10 U.S.C. § 861. By congressional mandate, both this court and our superior court must review a case in which the approved sentence includes the death penalty. Art. 66(b)(1), UCMJ; Art. 67(a)(1), UCMJ.

■ Every appellant has a right to the timely appellate review of his court-martial conviction and sentence. *Toohey v. United States*, 60 M.J. 100, 101 (C.A.A.F.2004); *Diaz v. The Judge Advocate General of the Navy*, 59 M.J. 34, 37 (C.A.A.F.2003). This right has both due process constitutional and Article 66, UCMJ, statutory roots. *Toohey*, 60 M.J. at 101. To determine whether appellate delay violates the right to timely review, we consider four factors: (1) length of the delay; (2) reasons for the delay; (3) the appellant's assertion of his right to a timely appeal; and (4) prejudice to the appellant. *Id.* at 102.

■ The length of appellate delay is a threshold factor that determines whether continued analysis is necessary. If the delay is not excessive, further scrutiny may be avoided. If the delay is excessive, the other factors must be applied and evaluated.

■ We conclude that the delay in appellate review has been excessive. This case sat

in the Appellate Defense Division for nearly five years before a brief was filed. While no "talismanic number of years or months (of appellate delay)" has been established as a hard-and-fast test, *Id.* at 103 (quoting *Coe v. Thurman,* 922 F.2d 528, 531 (9th Cir.1990)), based on the facts and circumstances of this case, we are convinced that nearly six years from docketing to placing the case in panel for decision is too long.

The second factor is the reasons for the delay. We note that at least six appellate defense counsel entered appearances before the filing of the appellant's brief and assignment of errors. As the appellate delay lengthened, we held chambers conferences to discuss the delay in filing and encourage counsel to file a brief as soon as possible. Based on our discussions in those conferences and various appellate filings, particularly the 37 Motions for Enlargement of Time to file a brief, we find that a certain "revolving-door" mentality was the most significant obstacle to preparing and filing the brief. In other words, appellate defense counsel consciously or subconsciously deferred writing a brief in this case until they transferred or left active duty, when the case would be turned over to a successor appellate defense counsel. We sympathize with these appellate defense counsel who faced the daunting task of reading and digesting thousands of pages of transcript and exhibits, then preparing a brief in this capital case, particularly when those counsel had many other assigned cases that required their attention. However, upon entering an appearance, each of these attorneys had an obligation to read the record and file a brief in a timely manner.

The third factor is the appellant's specific demand for a timely appeal. In this case, the appellant has not filed such a specific demand.

The fourth and final factor is prejudice to the appellant. Based strictly on the passage of time, no prejudice has been asserted, and no prejudice is apparent in the record and allied papers.

Thus, after applying the four-factor test, we conclude that the appellant has demonstrated no material prejudice. However, as our previous orders in this case indicate, we do not condone the length of time required to produce the appellant's initial brief in this case.

Notwithstanding our conclusion that no material prejudice has been demonstrated, we may still afford the appellant relief stemming from our broad powers under Art. 66, UCMJ. *Toohey,* 60 M.J. at 103–04; *United States v. Tardif,* 57 M.J. 219 (C.A.A.F.2002). Based on our review of the entire record, we decline to grant relief for appellate delay.

## VII. Conclusion

Based on our decision on the challenge for cause, the remaining assignments of error are moot. The findings and sentence are set aside. The record is returned to the Judge Advocate General for remand to an appropriate convening authority. A rehearing may be ordered. If a rehearing is not ordered, the charges and specifications shall be dismissed.

Senior Judge CARVER concurs.

RITTER, Senior Judge (concurring in part and dissenting in part):

I concur with the majority opinion, except as to the appropriate remedy for the military judge's erroneous grant of the Government's challenge for cause against Master Sergeant (MSgt) Buckham. I am not persuaded that the findings must be set aside. I would vote to set aside the sentence only, and order a rehearing on sentence.

The majority properly cites two United States Supreme Court decisions that found only the sentence is affected when a juror is improperly dismissed because of his or her views on capital punishment that do not rise to the level of "preventing or substantially impairing" that person's ability to perform the duties of a juror. Yet, the majority fails to distinguish these binding precedents while concluding that "military due process" requires us to set aside both the sentence and the findings in this case. Both *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) involved improper grants of prosecu-

tion challenges for cause, just as we have in this case. The Supreme Court saw no need to set aside the findings in those cases, and the same logic applies here.

In attempting to establish that "military due process" requires that the findings be set aside, the majority relies primarily on two military precedents. One case was decided by our superior court, *United States v. Giles,* 48 M.J. 60 (C.A.A.F.1998), and the other by this court, *United States v. Pritchett,* 48 M.J. 609 (N.M.Ct.Crim.App.1998). Neither case involved a member being dismissed because of his views concerning the death penalty, as occurred in this case and in the two United States Supreme Court cases cited above. Moreover, the two military cases are easily distinguishable for another reason.

In *Giles,* the military judge's improper denial of a defense challenge for cause left a member who had "clearly demonstrated an actual bias" on the panel. *Giles,* 48 M.J. at 63. That member's biased approach to sentencing in drug distribution cases logically suggested the possibility of bias in the findings stage of drug distribution cases as well. Similarly, in *Pritchett,* this court presumed prejudice from the military judge's improper denial of the defense's statutory right to peremptorily challenge a member. Since this statutory right allows the defense to dismiss a member they believe might vote unfavorably to the accused, leaving this member on the panel arguably stacked the court against him. Thus, in both cases, the military judge *improperly allowed a member who should have been dismissed to remain on the panel,* thereby leaving a members panel that was stacked against the accused to deliberate both on findings and the sentence.

Here, the military judge's error left no member on the panel who harbored an actual bias against the appellant, as in *Giles,* or one whom the defense had a statutory right to

have dismissed, as in *Pritchett.* It follows that the remaining members panel was not tainted in any way that could affect its deliberations on findings. Moreover, our reading of the record convinced this court that MSgt Buckham *had no difficulty at all* in considering the death penalty. Thus, his dismissal can hardly be said to have prejudiced the appellant, unless perhaps the appellant *desired* the death penalty.

Nevertheless, since *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court has consistently held that a death penalty cannot be executed where a juror's misgivings about the use of capital punishment were the basis for his or her dismissal, unless those views are so rigid as to hinder the performance of duty as a juror. Our ruling cannot change the fact that the military judge dismissed MSgt Buckham for this improper reason, even if the military judge's rationale is not supported by the record. We must therefore set aside the sentence.

But our reasoning in no way suggests the members' decision on findings was legally deficient. Although the appellant argues that MSgt Buckham's dismissal "ced[ed] a vote to the [G]overnment at each of the four death penalty gates[,]" our reading of the record suggests that MSgt Buckham's dismissal just as likely *eliminated* a vote for the Government at every stage of trial.

For these reasons, I respectfully dissent as to setting aside the findings.