UNITED STATES, Appellee/Cross-Appellant

v.

Jessie A. QUINTANILLA, Sergeant
U.S. Marine Corps, Appellant/Cross-Appellee

Nos. 05-0274 and 05-5001

Crim. App. No. 9801632

United States Court of Appeals for the Armed Forces

Argued December 6, 2005

Decided March 28, 2006

EFFRON, J., delivered the opinion of the Court, in which GIERKE,
C.J., and CRAWFORD, BAKER, and ERDMANN, JJ., joined.

Counsel


For Appellant/Cross-Appellee:  Lieutenant Commander Jason S.
Grover, JAGC, USN (argued); Lieutenant Colonel Joseph R. Perlak,
USMC, Lieutenant Elysia G. Ng, JAGC, USN, and Lieutenant Stephen
C. Reyes, JAGC, USNR (on brief); Captain Pamela A. Holden, JAGC,
USN.


For Appellee/Cross-Appellant:  Major Wilbur Lee, USMC (argued);
Commander Charles N. Purnell II, JAGC, USN, and Captain Glen R.
Hines, USMC (on brief); Colonel William K. Lietzau, USMC.



Military Judge:  J. F. Blanche



THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer and enlisted members, Appellant/Cross-Appellee (Appellant) was convicted, contrary to his pleas, of premeditated murder, in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (2000). In addition, the court-martial convicted Appellant, contrary to his pleas, of attempted unpremeditated murder (two specifications), violation of an order, aggravated assault (two specifications), unlawfully carrying a concealed weapon, communicating a threat, and obstruction of justice, in violation of Articles 80, 92, 128, and 134, UCMJ, 10 U.S.C. §§ 880, 892, 928, 934 (2000). Appellant was sentenced to death, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority approved the adjudged sentence. On appeal, the United States Navy-Marine Corps Court of Criminal Appeals set aside the findings and sentence and authorized a rehearing. United States v. Quintanilla, 60 M.J. 852, 863, 868 (N-M. Ct. Crim. App. 2005).

The Judge Advocate General of the Navy certified the following issues under Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2000):

> I.  WHETHER THE NAVY-MARINE CORPS COURT OF
>     CRIMINAL APPEALS ERRONEOUSLY APPLIED A
>     HEIGHTENED STANDARD OF REVIEW IN
>     DETERMINING THAT THE MILITARY JUDGE
>     ABUSED HIS DISCRETION BY GRANTING THE

GOVERNMENT'S CHALLENGE FOR CAUSE
AGAINST MASTER SERGEANT BUCKHAM, A
VENIREMAN IN THE CASE.

II.  WHETHER THE NAVY-MARINE CORPS COURT OF
CRIMINAL APPEALS IMPROPERLY CONSIDERED
A POST-TRIAL AFFIDAVIT FROM MASTER
SERGEANT BUCKHAM, A VENIREMAN IN THIS
CASE, IN DETERMINING THAT THE MILITARY
JUDGE ABUSED HIS DISCRETION BY GRANTING
THE GOVERNMENT'S CHALLENGE FOR CAUSE.

III. WHETHER THE NAVY-MARINE CORPS COURT OF
CRIMINAL APPEALS ERRED WHEN IT SET
ASIDE BOTH THE FINDINGS AND SENTENCE,
RATHER THAN THE SENTENCE ALONE, AS A
REMEDY FOR THE MILITARY JUDGE'S EXCUSAL
OF A VENIREMAN.

On Appellant's petition, we granted review of the following

issues:

I.  THE LOWER COURT FOUND ERROR IN THE
MILITARY JUDGE'S FAILURE TO SEQUESTER
THREE GOVERNMENT WITNESSES BUT HELD
THAT THE ERROR DID NOT PREJUDICE THE
APPELLANT.  DID THE LOWER COURT
PROPERLY APPLY THE TEST FOR PREJUDICE
UNDER UNITED STATES v. LANGSTON, 53
M.J. 335 (C.A.A.F. 2000) AND UNITED
STATES v. SPANN, 51 M.J. 89 (C.A.A.F.
1999)?

II.  THE LOWER COURT FOUND THAT THE MILITARY
JUDGE USED AN INCORRECT LEGAL TEST IN
GRANTING A GOVERNMENT CHALLENGE FOR
CAUSE BECAUSE A MEMBER MIGHT HAVE
"DIFFICULTY" IN VOTING FOR A DEATH
SENTENCE.  DID THE LOWER COURT ERR IN
NONETHELESS CONCLUDING THAT THE
MILITARY JUDGE DID NOT ABUSE HIS
DISCRETION IN GRANTING THE CHALLENGE
FOR CAUSE?

III. THE LOWER COURT FOUND MULTIPLE
OCCASIONS OF PROSECUTORIAL MISCONDUCT

                        IN THE COURT-MARTIAL.  DID THE LOWER
                        COURT ERR IN DETERMINING THAT THE
                        APPELLANT WAS NOT PREJUDICED BY THE
                        PROSECUTORIAL MISCONDUCT?

For the reasons set forth below, we conclude that the military judge erred in granting a prosecution challenge to a panel member.  We also conclude that the lower court erred in setting aside the findings as a remedy for the military judge's error.  We affirm that portion of the lower court's decision ordering further proceedings on the sentence.


# I.  BACKGROUND

Appellant entered the office of his squadron executive officer (XO), Lieutenant Colonel (LtCol) Daniel Kidd, at Camp Pendleton, California, and shot him.  LtCol Kidd staggered into an adjacent room where the squadron commanding officer (CO), LtCol Thomas Heffner, was preparing for an inspection.  Appellant entered the room, shot LtCol Heffner in the chest, and shot LtCol Kidd again.  LtCol Heffner was able to escape.  LtCol Kidd died shortly thereafter.

As Appellant pursued LtCol Heffner, he pointed his pistol at two Marines but did not discharge the weapon.  Appellant shot at and missed a third Marine, who disarmed Appellant.  Appellant fled, encountered a number of Marines who were unaware of the

4

shootings, and said: "Gunnery Sergeant, apprehend me, I just shot the CO and XO." See Quintanilla, 60 M.J. at 854-55.

## II. THE GOVERNMENT'S CHALLENGES FOR CAUSE
### (CERTIFIED ISSUES I, II, AND III, AND GRANTED ISSUE II)

### A. BACKGROUND

At the ensuing court-martial, the military judge granted the prosecution's challenge for cause against two members of the panel, LtCol D'Ambra and Master Sergeant (MSgt) Buckham III. The Court of Criminal Appeals ruled that the military judge erred in granting the challenge as to MSgt Buckham but did not err in granting the challenge as to LtCol D'Ambra. Id. at 860-61. In Certified Issues I-III, the Government seeks to reverse the court below with respect to MSgt Buckham, thereby sustaining the ruling by the military judge. In Granted Issue II, Appellant seeks to reverse the court below with respect to LtCol D'Ambra, thereby overturning the military judge.

During voir dire, the military judge permitted counsel to examine the panel members for the purpose of identifying possible grounds for challenge. See Rule for Courts-Martial (R.C.M.) 912(d). We shall consider below the statements by LtCol D'Ambra and MSgt Buckham, the views of the parties at trial, and the rulings of the military judge.

1.  Voir Dire of MSgt Buckham

    In response to questions from trial counsel about his religious beliefs, MSgt Buckham stated that he was a deacon in a Baptist church that was part of the Baptist General Conference. Trial counsel inquired as to the views of the Baptist General Conference on the death penalty:

> Q:  Now, do you know what the church's stand or what their plank is on the death penalty?
>
> A:  Our -- to the best of my knowledge, our church has no official position.

Trial counsel also asked whether the death penalty had been the topic of conversation at the church:

> Q:  Have you ever discussed that in church or discussed that in some Bible studies, stuff like that, conversations like that, the death penalty?
>
> A:  Not that I recall, sir.

After receiving these negative replies, trial counsel sought to explore MSgt Buckham's views on the Bible:

> Q:  Okay.  Describe for me generally the death penalty in the biblical context.
>
> A:  Well, sir, I certainly haven't formed a conviction of what the Bible says about the death penalty.

Following an extended discussion of a biblical passage, trial counsel asked:

> Q:  Do you think from that parable of the Bible and that story that Christ has forbidden you, if you believe in

6

Christianity from voting for the death
penalty?

A:  I don't believe that is particularly
something that would go into building a
conviction about the death penalty.

Q:  Is there --

A:  Not -- I do not -- I don't believe that
that prohibits me from thinking that the
death penalty is a valid action.

Q:  Okay.  I got the impression there was
something else that you were going [to] say.
Is there maybe something else there that
would prohibit you from considering that?

A:  No, sir.

Q:  Nothing else in the New Testament?
Anything else in the Bible that you think
makes you kind of sit back and say, you
know, I'm not sure we should be doing this?

A:  No, sir.  I believe the death penalty is
a not often used means of -- of -- of a
penalty, that if -- if warranted, is just.
And I also think it is a -- is a factor in
society that would prohibit others from
doing like crimes.

Trial counsel then sought to explore whether MSgt Buckham might

pray before making a major decision, such as whether to impose

the death penalty:

Q:  Let me ask you this:  As a Christian, do
you pray about important decisions?

A:  Yes, sir.

Q:  Significant decisions, you seek
direction from God?

A:  Yes, sir.

ADC: Sir, objection. At this point, I think we're getting way too personal with the [Master Sergeant]. These are personal convictions that don't need to be aired in this courtroom.

MJ: Sustained. Let's move on.

ATC: Generally, sir -- I'll back off from that. But the one question I wanted to get to, sir, was whether in this case the Master Sergeant felt that when he voted for death or not to vote for death, whether he would consider that a decision he would need to pray about.

MJ: All right. You can ask that question.

Q: Does that question kind of make sense to you, Master Sergeant?

A: Sir, would you ask the question again, please.

Q: When you go back in that deliberation room and you're all talking about -- if we ever get to that point, okay, and you are deciding whether to vote for the death penalty for Sergeant Quintanilla or vote against the death penalty, is that a decision that you feel that is one of those important decisions that we just talked about that you would actually pray about and seek direction from God about?

A: Sir, my -- my aim is to live my life in prayer through the meditation of God's word and the application of that word on a daily, even hourly basis. So in answer to that question, yes, I would make it a matter of prayer.

Q: I'm certainly not trying to give you the impression that you shouldn't do that at all.

A: Understood, sir.

Defense counsel then asked MSgt Buckham to elaborate on the responses he had given to trial counsel's questions about religion:

> ADC:  [Master Sergeant], I take it from your discussion [with trial counsel] that you possess a great personal faith and that faith is a very high priority in your life; correct?
>
> A:  That's correct, sir.
>
> Q:  And when asked about would you weigh this -- would you have to pray about this decision, I take it from the way you live your life you pray about all weighty decisions and that's a part of who you are. Fair enough?
>
> A:  Yes, sir.
>
> . . . .
>
> Q:  And if [the military judge] tells you how this case shapes up, if the death penalty is a valid and authorized penalty, then you have to be able to consider that and be able to possibly do that.  Are you able to do that, [Master Sergeant]?
>
> A:  To consider what the judge --
>
> Q:  Right.  Exactly.  If [the military judge] tells you that the death penalty may be authorized in this case, and this [is] an authorized punishment, you have to be able to consider using the death penalty or ordering the death penalty.  Can you do that?
>
> A:  Yes, I can, sir.

2.  Voir Dire of LtCol D'Ambra

Trial counsel asked LtCol D'Ambra about his willingness to consider the death penalty:  "If the government meets all of its burdens in this case . . . can you seriously consider the death penalty in this case?"  LtCol D'Ambra responded:  "I can consider it."  Trial counsel noted that on his pretrial questionnaire, LtCol D'Ambra stated that he had "mixed" feelings about the death penalty, and asked:  "Do you have any leanings one way or another that you feel will give you trouble considering the death penalty?"  In response, LtCol D'Ambra said that he was not sure what trial counsel was "driving at."  He added:

> Basically it would be religious -- for
> religious reasons, whether I am -- I just
> can't make that decision at this time over
> something I was afraid of whether I could
> actually vote for a death penalty.  I mean,
> I certainly feel that it is justified but
> it's the other side that contradicts whether
> it is ever warranted.

The dialogue then turned to LtCol D'Ambra's religion:

> Q:  Sir, I notice from your questionnaire
> you are -- you're a practicing Catholic.
>
> A:  Yes.
>
> Q:  Is there anything about that, your
> religion, that will prevent you from
> seriously considering the death penalty
> should the government, again, meet all of
> its burdens in this case?

10

> A: Well, as far as I know the Catholic
> church does -- is against the death penalty.
> But, again, it all goes to a conscious
> decisions [sic] I'll have to make and it's
> just something that I'll have to wait and
> consider.

Trial counsel asked specifically about the relationship between LtCol D'Ambra's religious affiliation and the application of the death penalty in the present case:

> Q: Will you have difficulty considering the
> death penalty, should the government meet
> all of its burdens, because of your
> religion?
>
> A: I don't know if I'll have difficulty but
> it's going to be something that I'll have to
> wrestle with, yes.

In response to questions by defense counsel, LtCol D'Ambra confirmed that he would not rule out the death penalty. LtCol D'Ambra responded affirmatively when defense counsel asked whether he would be able to weigh and consider the death penalty "if the military judge instructs you that the death penalty may be a valid option of punishment in this case."

3. The Government's challenges to LtCol D'Ambra and MSgt Buckham

Following voir dire, trial counsel challenged several members of the panel for cause, including LtCol D'Ambra and MSgt Buckham. With respect to LtCol D'Ambra, trial counsel argued:

> Our basis would be in his discussion about
> his religious faith and that he would need
> to pray about his decision in regard to the
> death penalty. It's an obvious notation

11

> that he's a practicing Catholic and the
> Catholic churches oppose to [sic] the death
> penalty.
>
> We believe that would certainly leave the
> impression that he could not consider that -
> - the fact -- I think it works both ways in
> this case.  The fact if he's praying about
> this decision or feels his religious
> decision is that, in fact, he should give
> the death penalty or shouldn't give it,
> that's not going to be based on the evidence
> presented in this case but on a more
> personal side of the house in his prayer
> life, I guess is better words.

Defense counsel responded by highlighting the statement by LtCol D'Ambra that he could consider the death penalty.  Defense counsel also took the position that a panel member should not be excused for praying over a major decision:  "Simply by the fact that he may need to pray over a big decision shouldn't excuse him, sir.  We take that into court when we make our decisions. Members take their real life experiences and use that to make their decisions."

Trial counsel next challenged MSgt Buckham, stating: "Again, same similar issues on that one, sir.  Again, he discusses about seeking guidance from God, praying about that decision."  Noting that MSgt Buckham reacted emotionally when faced with questions regarding his religious beliefs, trial counsel said:  "If he's having a difficult time at this point certainly when we're at that stage of the trial he's going to be faced with that same or similar difficulty."

In response, defense counsel said:

> We object to that, sir.  It's not a basis
> for a challenge for cause.  He states he
> feels the death penalty is a deterrent.
> He's not prohibited from imposing the death
> penalty by any religious beliefs.  There's
> nothing in his biblical studies that would
> restrict him from imposing the death
> penalty.  He could consider it.  Simply
> because he's emotional and he may pray about
> something, the same arguments before with
> the Lieutenant Colonel, sir.  You shouldn't
> excuse him.  It's not a basis for any
> challenge for cause.

The military judge then asked defense counsel about MSgt

Buckham's visual emotional reaction during voir dire.  Defense

counsel responded:

> Sir, there's no substantial doubt as to if
> he's sitting on the court as a member as to
> legality, fairness and impartiality, and
> that's what R.C.M. 912 says as a basis for a
> challenge.  He simply was somewhat emotional
> realizing it's going to be an important
> decision but in no way -- no which prohibit
> him and it's not a basis for a challenge,
> sir.

4.  The military judge's ruling on the Government's challenges for cause

   The military judge granted the challenges for cause against

LtCol D'Ambra and MSgt Buckham.  The military judge focused his

ruling on the religious beliefs of the two challenged members:

> Based on the guidelines of R.C.M.
> 912(f)(1)(N), it is my mandate as military
> judge to ensure that this court-martial be
> free from substantial doubt as to fairness
> and impartiality of the members.  Applying
> this guidance based on the responses by

13

> Lieutenant Colonel D'Ambra and Master
> Sergeant Buckman . . ., the court opines
> that based on their strongly held religious
> beliefs they will have difficulty in
> considering the entire range of punishments
> in this case.

## B.  DISCUSSION

### 1.  Standard of review

We review a military judge's decision on a challenge for cause for a "clear abuse of discretion." United States v. James, 61 M.J. 132, 138 (C.A.A.F. 2005).  An abuse of discretion occurs if the military judge's findings of fact are clearly erroneous or if the decision is influenced by an erroneous view of the law.  United States v. Gore, 60 M.J. 178, 187 (C.A.A.F. 2004).

A "military judge's ruling on a challenge for cause is given great deference."  United States v. Rolle, 53 M.J. 187, 191 (C.A.A.F. 2000) (internal quotation marks omitted).  In the course of reviewing the military judge's ruling on a challenge for cause, it is "appropriate to recognize the military judge's superior position to evaluate the demeanor of court members." James, 61 M.J. at 138.

Although we take into account the views of the Court of Criminal Appeals on challenges for cause, we typically employ a direct review of the ruling of the military judge.  See United States v. Siroky, 44 M.J. 394, 399 (C.A.A.F. 1996); James, 61

14

M.J. at 139.  In that context, it is appropriate at this point to address Certified Issues I and II, which involve two aspects of the opinion issued by the Court of Criminal Appeals.

Certified Issue I asks whether the court below erred in declining to apply the standard set forth in Rolle, 53 M.J. at 191.  See Quintanilla, 60 M.J. at 859.  We answer that question in the affirmative.  Rolle addresses the degree of deference that should be applied by an appellate court after scrutinizing the record.  Id. at 192-93.  The careful scrutiny that accompanies capital cases is not incompatible with applying the Rolle standard of review after that scrutiny has been completed. In any case, because we are reviewing the decision of the military judge, any error by the court below in employing a standard of review does not affect our review.

Certified Issue II asks whether it was appropriate for the court below to rely on a post-trial affidavit of MSgt Buckham to assess the validity of the ruling by the military judge on the challenge to that member.  See Quintanilla, 60 M.J. at 861-62. The court below did not identify any reason to depart from the normal practice of relying on the factual information developed in the record of trial when addressing challenges for cause. See United States v. Vangelisti, 30 M.J. 234, 237 (C.M.A. 1990). Accordingly, we answer the second certified question in the affirmative.  As we noted with respect to Certified Issue I, any

15

error by the court below in this regard is immaterial to our direct review of the decision at trial by the military judge.

2. <u>Standard applicable to rulings on challenges for cause</u>

R.C.M. 912(f)(1)(N) sets forth the applicable provision of law. Under the rule, a panel member shall be excused for cause when the member should not sit "in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." <u>Id.</u> Under this provision, a member who has "an inelastic opinion concerning an appropriate sentence for the offenses charged" may be challenged. R.C.M. 912(f)(1)(N) Discussion; <u>James</u>, 61 M.J. at 138.

When the issue of an inelastic opinion arises in a capital case with respect to the imposition of the death penalty, the Supreme Court's decision in <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985), supplies the applicable legal standard. In <u>Wainwright</u>, the Supreme Court articulated the following standard for determining whether a prospective juror could be excluded for cause because of his or her views on capital punishment: "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Id.</u> at 424 (internal quotation marks omitted); <u>see also</u> <u>United States v. Gray</u>, 51 M.J. 1, 31-32 (C.A.A.F. 1999).

3.  Review of the military judge's ruling on MSgt Buckham

The military judge cited MSgt Buckham's religious beliefs in granting the Government's challenge.  The military judge did not apply the standard in Wainwright or otherwise identify any aspects of MSgt Buckham's beliefs that would satisfy the Wainwright standard.

The Government suggests that we should treat the military judge's ruling as incorporating trial counsel's argument that MSgt Buckham warranted excusal because of his emotional demeanor.  The military judge's ruling, however, did not cite or rely upon trial counsel's argument, which was rebutted by the defense, and did not address the disagreement between the parties.

Instead, the military judge focused erroneously on the "religious beliefs" of MSgt Buckham.  MSgt Buckham repeatedly emphasized that no restrictions on voting for the death penalty flowed from his religious affiliation.  MSgt Buckham simply noted that, as a religious person, he would pray in the course of making an important decision.  That statement contains no suggestion that his "religious beliefs" would preclude him from following and applying the instructions of the military judge in accordance with his oath as a panel member.  See James, 61 M.J. at 138.  Accordingly, the military judge erred in granting the Government's causal challenge against MSgt Buckham.  In view of

17

our conclusion, we need not decide the related issue concerning the military judge's decision granting the prosecution's challenge for cause against LtCol D'Ambra.

4. Remedy

The lower court set aside the findings as well as the sentence. Quintanilla, 60 M.J. at 863, 868. Certified Issue III asks whether the court below erred in setting aside the findings. The Government contends that the appropriate remedy would be to affirm the findings, set aside the sentence, and authorize a rehearing on the sentence. We review the question of whether the remedy developed by the lower court was appropriate for an abuse of discretion. See United States v. Manuel, 43 M.J. 282, 288 (C.A.A.F. 1995).

The military judge granted the challenges at issue because of his concerns regarding the members' ability to impose a certain sentence, the death penalty. In Witherspoon v. Illinois, 391 U.S. 510, 516-18 (1968), the Supreme Court addressed whether the findings as well as the sentence should be set aside when jurors were improperly excused due to their views on the death penalty. The Supreme Court held that only the sentence should be reversed, stating: "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative

18

jury on the issue of guilt or substantially increases the risk of conviction." Id. at 517-18. Although the Supreme Court has subsequently modified other aspects of Witherspoon, see Wainwright, 469 U.S. at 418-26, the Court has not altered its view as to the appropriate remedy for improper exclusion. See, e.g., Gray v. Mississippi, 481 U.S. 648, 668 (1987); Adams v. Texas, 448 U.S. 38, 51 (1980).

Supreme Court precedents developed in cases arising outside the military justice system are applied as precedents in the military justice system unless distinguishable based upon unique military justice considerations. See, e.g., United States v. Matthews, 16 M.J. 354, 369 (C.M.A. 1983); Article 36, UCMJ, 10 U.S.C. § 836 (2000). The defense suggests that Witherspoon is not applicable in the military justice system, relying on our decision in United States v. Giles, 48 M.J. 60 (C.A.A.F. 1998). In Giles, we set aside the findings and sentence after concluding that the military judge abused his discretion by denying a defense challenge for cause against a member. Id. at 63. Giles, however, addresses consequences that are not at issue in the present case, related primarily to the fact that the parties in the military justice system are limited to a single peremptory challenge. See id. at 62; Article 41(b), UCMJ, 10 U.S.C. § 841(b) (2000).

19

If a defense challenge to a panel member is denied, as in Giles, the defense must decide whether to allow the disqualified member to sit on the panel or to use its single peremptory challenge against that member. Under such circumstances, the erroneous denial of a defense causal challenge creates a significant burden on the statutory right of the defense to exercise a peremptory challenge to remove a member objectionable to the defense. In that context, we concluded in Giles that the appropriate remedy required reversal of the findings and the sentence. Id. at 63.

Here, however, the military judge's erroneous ruling had no impact on the defense's right to exercise a peremptory challenge. Additionally, there has been no allegation that any of the members who sat on the panel held a bias against Appellant or otherwise should have been disqualified. See id.

A departure from Witherspoon is not warranted by our precedent or by the unique aspects of the military justice system. Accordingly, we reverse the lower court's decision to the extent that it set aside the findings as a remedy for the military judge's erroneous grant for the prosecution's challenge for cause.

III. FAILURE TO SEQUESTER WITNESSES (GRANTED ISSUE I)

In a pretrial session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), trial counsel moved to allow the widow and brother of LtCol Kidd and the wife of LtCol Heffner to remain in the courtroom as spectators. Trial counsel acknowledged that all three were likely to be called as Government witnesses during sentencing but argued that a federal statute allowed their presence at trial. Despite defense counsel's objection under Military Rule of Evidence (M.R.E.) 615, which provides for the exclusion of witnesses at the request of either party, the military judge allowed the three to sit in on the trial, and they later testified during sentencing.

In the present appeal, Appellant maintains that the failure to sequester the witnesses was prejudicial error under M.R.E. 615. The Government concedes that there was error but argues that no prejudice arose from the error because the witnesses' testimony was limited to victim impact evidence, which was not affected by the trial proceedings. See United States v. Spann, 51 M.J. 89, 93 (C.A.A.F. 1999) (holding that the military judge erred by applying the federal statute instead of M.R.E. 615 but finding no prejudice); United States v. Langston, 53 M.J. 335, 338-39 (C.A.A.F. 2000) (finding no prejudice arising from the military judge's failure to sequester witnesses); Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000) ("A finding or sentence of a

21

court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.").

It is not necessary to address the merits of Appellant's argument to determine that no additional relief can arise from this claim. Prejudice under M.R.E. 615 is determined by considering whether the witness's testimony was affected by the trial proceedings that the witness heard. See Langston, 53 M.J. at 338; Spann 51 M.J. at 93. The three witnesses at issue testified only on sentencing. Therefore, even if their testimony was altered by what they heard at trial, the effect would not have been relevant to the members' determination of guilt. In view of our decision to reverse the sentence on other grounds, we need not address the question of prejudice.

IV. PROSECUTORIAL MISCONDUCT (GRANTED ISSUE III)

Appellant alleges that the findings and sentence should be set aside as a remedy for various incidents of prosecutorial misconduct that took place before, during, and after his trial. Appellant claims that the lower court erred in its ruling on this issue because, despite finding that prosecutorial misconduct occurred, the lower court concluded that the misconduct did not result in prejudice and declined to grant relief on this basis. See Quintanilla, 60 M.J. at 863-67.

22

Because we have concluded that the sentence should be set aside, we consider this issue only with respect to findings.

The lower court addressed the allegations of prosecutorial misconduct "to discourage any repetition of these actions in a rehearing." Id. at 863. We agree that it was appropriate for the lower court to comment on the conduct of Government counsel. For the following reasons, we also agree with the conclusion of the lower court that the actions of Government counsel did not prejudice the findings in this case. See United States v. Meek, 44 M.J. 1, 5 (C.A.A.F. 1996).

Prior to trial, assistant trial counsel engaged in an ex parte communication with the Article 32, UCMJ, 10 U.S.C. § 832 (2000), Investigation Officer. See Quintanilla, 60 M.J. at 863. Appellant raised this issue at trial as part of the basis for his request to have the Article 32, UCMJ, investigation reopened. After hearing testimony from the Investigation Officer and a witness to the conversation, the military judge denied the request, stating that the conversation gave rise to an "appearance of impropriety" but finding that the conversation had no impact on the Article 32, UCMJ, investigation. The lower court found that "this conversation did not just appear to be improper, it was improper." Id. at 864. We agree, however, with the determination of both the military judge and the lower court that the improper conversation did not result in

23

prejudice, particularly in light of the military judge's finding that the conversation had no bearing on the Article 32, UCMJ, investigation. See United States v. Argo, 46 M.J. 454, 457, 459 (C.A.A.F. 1997).

In a separate pretrial matter, the assistant trial counsel sent two e-mail messages to the prospective members of the panel. The e-mails advised the members of the trial schedule but were not sent to the defense. In a post-trial lecture to a capital litigation course at the Naval Justice School, the assistant trial counsel explained that he wrote the e-mail with the goal of establishing favorable opinions and trust from the members. Although this may demonstrate that assistant trial counsel had a subjective ulterior motive, an objective reading of the e-mails does not reveal this motive. Furthermore, considering the extent and strength of the evidence against Appellant in this case, these e-mails would not have influenced the members' determination of guilt.

During the court-martial, trial counsel testified on a motion and then argued the motion, relying on his own testimony. See Quintanilla, 60 M.J. at 864-65 (detailing the background of the motion). The lower court correctly concluded that this amounted to a violation of the ethical rule prohibiting attorneys from acting as both an advocate and a witness on the same matter. Id. at 865. See Dep't of the Navy, Judge Advocate

24

General Instr. 5803.1A, Professional Conduct of Attorneys Practicing Under the Supervision of the Judge Advocate General [hereinafter JAGINST 5803.1A], Rule 3.7(a) (July 13, 1992), replaced by JAGINST 5803.1B (Feb. 11, 2000). This motion, however, was argued in an Article 39(a), UCMJ, session outside the presence of the members, so it would not have impacted the members' findings.

Appellant also points to the assistant trial counsel's sentencing argument, which the counsel later described as "highly objectionable" during his post-trial lecture to the Naval Justice School. He engaged in tactics such as sitting on the witness stand, screaming at Appellant, and using words such as "bad hombre," "animal," and "gang-banging." Again, however, this argument did not prejudice the findings because the sentencing argument was made after the findings were entered.

The court below noted that these problems persisted after trial. Quintanilla, 60 M.J. at 865. An investigation undertaken by the Naval Criminal Investigative Service revealed that the trial counsel and assistant trial counsel impermissibly withheld evidence from the evidence custodian. Id. Given the post-trial timing of this conduct, however, it did not prejudice Appellant's court-martial. See Article 59(a), UCMJ.

Although we agree with the court below that there was no prejudice, we note that the court expressly concluded that

25

<u>United States v. Quintanilla</u>, Nos. 05-0274/MC and 05-5001/MC

Government counsel violated a number of ethical norms promulgated by the Navy in JAGINST 5803.1A, including:  Rule 3.5a -- the prohibition against certain ex parte communications; Rule 3.7(a) -- the prohibition against an attorney acting as an advocate and attorney in the same case; and Rule 8.4 -- the prohibition against an attorney engaging in illegal and unethical conduct.  <u>Quintanilla</u>, 60 M.J. at 864-65.  The court also stated that the prosecution's sentencing argument "violat[ed] various ethical canons."  <u>Id.</u> at 866 (citing American Bar Association Standards for Criminal Justice: Prosecution Function and Defense Function, Standards 3-5.2, 3-5.8(c) (3d ed. 1993)).  The court observed that Government counsel's "unethical conduct . . . . besmirched the military justice system . . . ."  <u>Id.</u> at 867.

The court took note of the responsibilities of the Judge Advocate General with regard to the administration of attorney discipline, <u>id.</u> at 865 n.4, but it is not clear whether the specific matters, strongly condemned by the court as egregious, were referred to the Judge Advocate General for review and action.  Accordingly, we direct the Clerk of the Court to transmit our opinion and the opinion of the court below to the Judge Advocate General of the Navy for appropriate consideration.

## V.   CONCLUSION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed to the extent that it set aside the findings of guilty.  The findings of guilty dismissed below are reinstated.  The decision of the Court of Criminal Appeals is affirmed to the extent that it set aside the sentence and authorized a sentence rehearing.  The record of trial is returned to the Judge Advocate General of the Navy for remand to an appropriate convening authority for a sentence rehearing. Thereafter, Articles 66(c) and 67(c), UCMJ, 10 U.S.C. §§ 866(c), 867(c) (2000), will apply.