# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

———————————————

### No. 201500400

———————————————

### UNITED STATES OF AMERICA
Appellee

v.

### RIGO J. BETANCOURT
Sergeant (E-5), U.S. Marine Corps
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel Elizabeth A. Harvey, USMC.
Convening Authority: Commanding General, 1st Marine Division,
Camp Pendleton, CA.
Staff Judge Advocate's Recommendation: Lieutenant Colonel Devin
C. Young, USMC.
For Appellant: Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Lieutenant Commander Jeremy Brooks, JAGC, USN;
Lieutenant Commander Justin Henderson, JAGC, USN.

———————————————

Decided 6 June 2017

———————————————

Before CAMPBELL, RUGH, AND HUTCHISON, *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

RUGH, Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of one specification of aggravated sexual contact and two specifications of assault consummated by

a battery in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920 and 928 (2012).[1]

The military judge also convicted the appellant, pursuant to his pleas, of one specification of conspiracy to commit assault, two specifications of violating a lawful general order, two specifications of signing a false record, one specification of cocaine use, one specification of possession of cocaine with intent to distribute, one specification of possession of methamphetamine with intent to distribute, one specification of larceny, one specification of forgery, and one specification of assault consummated by a battery in violation of Articles 81, 92, 107, 112a, 121, 123, and 128, UCMJ; 10 U.S.C. §§ 881, 892, 907, 912a, 921, 923, and 928 (2012).

The members sentenced the appellant to five years' confinement, reduction to pay grade E-1, total forfeiture of pay and allowances, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered the sentence executed.

The appellant asserts seven assignments of error (AOE): (1) that the evidence of the appellant's convictions for assault consummated by a battery and aggravated sexual contact was factually insufficient; (2) that the military judge abused her discretion in failing to suppress evidence derived from the search of the appellant's cell phone; (3) that the military judge abused her discretion in admitting evidence under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 404(b), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); (4) that a command authorized search of the defense counsel offices amounted to unlawful command influence; (5) that the search also amounted to prosecutorial misconduct; (6) that the military judge violated the appellant's right to counsel under the Sixth Amendment to the Constitution by disqualifying his original trial defense counsel and compelling them to testify against him at trial; and (7) that the promulgating order does not accurately reflect the court-martial's findings.[2]

After weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond reasonable doubt. *United States v.*

---

[1] After findings, the military judge dismissed one specification of assault consummated by battery as multiplicious. Record at 1706.

[2] In a supplemental AOE, the appellant argued the military judge erred in instructing the members regarding reasonable doubt. In accordance with the holding in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017), we summarily reject the supplemental assignment of error. *United States v. Clifton*, 35 M.J. 79, 81-82 (C.M.A. 1992).

*Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ)), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). Additionally, having carefully considered the record of trial, the pleadings, and oral argument on the second, fourth, and fifth AOE, we find no error materially prejudicial to a substantial right of the appellant and affirm.

## I. BACKGROUND

In July 2013, to cope with what he alleged was a close friend's death, the appellant joined a Southern California criminal motorcycle gang. During the process of first pledging then fully joining the gang, the appellant embarked on a course of reckless and criminal behavior. He began using cocaine with his then-girlfriend, Ms. MR. He acquired quantities of cocaine and methamphetamines, which he weighed and bagged for distribution to other gang members and "hangers-on."[3] He tattooed a swastika on his stomach, and publicly wore the accoutrements–the clothing, badges, and other symbols–of the criminal motorcycle gang. Additionally, he defrauded the government of basic allowance for housing (BAH) after he was divorced.

Marine Corps Criminal Investigative Division (CID) first learned of the appellant's offenses in December 2013 after he provided a positive urinalysis for cocaine. The investigation then expanded to include his affiliation with the criminal motorcycle gang and his other acts.

On 29 January 2014, the appellant conspired with a fellow gang member, First Sergeant Charles Reynolds, U.S. Marine Corps, to assault a gunnery sergeant because he believed the gunnery sergeant was attempting to pursue his girlfriend, Ms. HK. After the girlfriend tricked the gunnery sergeant into meeting at a local bar, the two men traveled to the bar where they surprised the gunnery sergeant and beat him.

In early March 2014 Ms. MR, who was now no longer the appellant's girlfriend, contacted a CID agent claiming to have information about the appellant's use of cocaine and his fraudulent claim to BAH. During follow-up interviews with agents, Ms. MR also provided information on the appellant's participation in the criminal motorcycle gang and his related possession of cocaine and methamphetamines. This included witnessing the appellant with a scale and small bags used for preparing controlled substances for distribution and sale.

---

[3] A term of art used to describe followers of the gang who were not members or pledges.

On 12 March 2014, after initially describing the appellant's criminal activities to CID, Ms. MR contacted the appellant via text message and bragged to him about what she had done.

> [Text from Ms. MR:] Don't expect to get anything from here either. All your gear won't be here. I'm getting rid of everything that u left here. Should a thought ab what u said to me before it [expletive] u worse. I'll be setting up with cid too. I never wanna see u again. I'll make sure I don't while you rot away in a jail cell at the brig. [Expletive] with the wrong one punk

> [Text from the appellant:] Why are you still texting me . . .

> [Text from Ms. MR:] Ur gonna be sorry u treated me this way

> [Text from the appellant:] There is nothing I can do to stop you . . . you been black mailing me with this for far to long . . . your gonna do it regardless[4]

After this exchange, the appellant drove to Ms. MR's home. Once there, the appellant and Ms. MR argued about his involvement in the criminal motorcycle gang. Ms. MR referred to the gang as "a bunch of losers," enraging the appellant.[5] He attacked Ms. MR, grabbing her by the throat.

> Q [Trial Counsel]: Do you remember how that happened?

> A [Ms. MR]: Honestly, it was just all – I just know he was screaming at me and, you know, telling me that this is–you know, this had to happen; I did this to myself; I just couldn't keep my mouth shut; and, you know, I don't talk about his club and those types of things.[6]

He then grabbed her by her crotch, and stated, "This [Ms. MR's vagina] is mine, nobody else's. This is mine."[7]

After the fight, the appellant left, and Ms. MR called 9-1-1 to report the assault. The appellant was placed in pretrial confinement on 14 March 2014, and photos were taken of his tattoos, including the swastika tattoo Ms. MR had previously described to the CID agent. As a result of the assault, Ms. MR suffered a hematoma in her vaginal area, requiring surgery, and bruises to her neck.

---

[4] Prosecution Exhibit (PE) 24 at 8-9 ([sic] throughout).

[5] Record at 1211.

[6] *Id.* at 1212.

[7] *Id.* at 1215.

Ten days after the appellant was placed in the brig, the appellant's Staff Non-Commissioned Officer-in-Charge (SNCOIC) contacted the appellant's detailed trial defense counsel, First Lieutenant (1stLt) I, with a request from the appellant–that the SNCOIC pass the appellant's cell phone over to 1stLt I to review it for potentially exculpatory text messages involving the assault on Ms. MR. 1stLt I agreed and took possession of the phone, its blue and white case, a phone charger, and an extra battery.

The next day, 25 March 2014, 1stLt I powered on the appellant's phone and reviewed the call logs and the text messages between the appellant and Ms. MR. While reviewing, 1stLt I took several screenshot images of potentially exculpatory text messages and then exported the images by connecting the phone to her government computer. During this process, 1stLt I deleted some of the screenshot images which she took and which were saved to the appellant's phone. She then stored the phone in a file cabinet drawer in her office located onboard Marine Corps Base Camp Pendleton, 22 Area. While in her possession, the blue and white case remained on the phone.

On 4 April 2014, 1stLt I filed a motion requesting the appellant's release from pretrial confinement. She included some of the screenshot images of the text messages from the appellant's phone in that motion. Shortly thereafter, 1stLt F was detailed to the case as an assistant defense counsel.

Now with knowledge of potentially exculpatory text messages on the appellant's phone, CID became interested in locating the phone. The trial counsel approached 1stLt I, who agreed to provide a copy of the remaining text messages involving Ms. MR from the phone to the government. At the time, there was a general consensus among the parties that 1stLt I would be able to turn over the phone to government agents if or when she was presented with a command authorization to search and seize the phone. With the assistance of the trial counsel, the lead CID agent drafted a probable cause affidavit to be presented to the 22 Area Commander as basis for a Command Authorized Search and Seizure (CASS). Based on indications that some of the appellant's text messages may have been deleted, the lead CID agent believed that the phone might contain inculpatory evidence and other incriminating messages, calls, and photos.

On 30 April 2014, an Article 32, UCMJ, preliminary hearing was held regarding the allegations against the appellant. 1stLt I again presented the screenshot images of the text messages as evidence. During the hearing, 1stLt I was informed by her senior defense counsel of the government's intention to obtain a CASS for the phone. After the hearing, 1stLt I passed the phone to her assistant counsel, 1stLt F.

1stLt F connected the powered-on phone to his government computer and transferred data from the phone to his computer. For unknown reasons, the

phone was also removed from its case. It was then stored in 1stLt F's locked desk drawer. The case, the charger, and the spare battery were placed in a separate desk drawer containing 1stLt F's personal items.

On 1 May 2014, the lead CID agent presented an affidavit requesting a search of "[t]he Defense Section, Legal Service Support Section located on the second floor of Building [X], MCB CPC, and/or the possession of defense trial counsels identified as [1stLt I] or [1stLt F]" and "[t]he personal Android cellular telephone belonging to [the appellant]" to the 22 Area Commander.[8] Based on the affidavit and other discussions the Area Commander determined that probable cause existed to believe that the appellant's phone contained evidence of his criminal activity. He then generally reduced this determination to writing in a CASS authorizing the search.

Sensitive to the potential issues involved in a search of defense counsel offices, the Area Commander also contacted the Legal Services Support Section–West (LSSS) Officer-in-Charge (OIC) to discuss the search. The LSSS OIC then discussed with the senior trial counsel (STC) the possibility of a preservation order pending judicial involvement post-referral of charges. The STC advised that a preservation order would be insufficient if the phone was remotely accessed when powered on. He also expressed concern that the phone might be returned to a friend of the appellant and, thereby, lost to the government.

That same evening, 1stLt F took the phone out of his office with the intention of returning the phone to the appellant's SNCOIC, who first provided the phone to the defense counsel. The SNCOIC was then to return the phone to Ms. HK, the appellant's then-girlfriend. However, instead of delivering the phone to the SNCOIC or Ms. HK, 1stLt F returned it to his office.

That evening and the next day, the LSSS OIC, the STC, the senior defense counsel, and the Marine Corps Chief Defense Counsel discussed the potential search of the defense spaces, including the primary concern that professional rules prevented 1stLt I and 1stLt F from returning the phone voluntarily. As a result of these discussions, the STC decided against using search procedures that would protect attorney-client privileged materials, because he believed the search would not require review of documents within the defense counsel's offices.[9] Instead, the STC and LSSS OIC agreed to other

---

[8] Appellate Exhibit (AE) XIII at 51.

[9] This was a belief partially perpetuated by the senior defense counsel's assertion that violation of the privilege wasn't a primary concern in turning over the phone to government agents.

safeguards, including video recording the search and conducting the search in the presence of the defense counsel. The LSSS OIC was not aware that the CASS also authorized searching defense counsel offices besides those of 1stLt I and 1stLt F.

On 2 May 2014, the STC met with CID agents at the LSSS offices in preparation for the search. The STC escorted the four agents–three searchers and one videographer–upstairs to the defense offices, where they requested the senior defense counsel produce the appellant's phone. The senior defense counsel politely declined. The CID agents then began their search in 1stLt I's office before moving on to 1stLt F's office. The agents were professional but extremely thorough, searching through desk drawers, file cabinets, lockers, garbage cans, and ceiling tiles. The agents opened case files, but quickly flipped through the files without pausing to read documents within the files. Two additional law enforcement officers secured the spaces prohibiting personnel from leaving during the search.

In 1stLt F's office, the agents discovered a phone matching the description of the appellant's phone in a desk drawer. In a separate drawer, the agents found a blue and white phone case, a phone charger, and a spare battery. 1stLt F declined to identify the phone, claiming privilege, and the agents seized the phone and accessories.

After searching 1stLt F's office, the agents continued to search the defense spaces including the offices of five other defense counsel who were not connected to the appellant's case. In all, the search took around two hours to complete.

Two weeks after the phone was seized from 1stLt F's office, a CID agent made a forensic copy of every file in the appellant's phone and provided it to a special taint review officer appointed by the LSSS OIC. The taint review officer "reviewed all the data from the cell phone," but only did so to identify attorney-client "privileged information" contained therein.[10] The officer found no privileged material in his review.

The agent then reviewed the forensic copy for relevant data and discovered digital photographs related to the appellant's membership in the criminal motorcycle gang in the "images" folder. Several of these photographs were admitted into evidence.[11] The forensic agent also identified several photographs in the "images" folder suggesting the appellant's participation in drug use and drug distribution,[12] including one of a "[w]hite powdery

---

[10] AE XIV at 75.

[11] Record at 1193; PE 14.

[12] Record at 1195-96; PE 16.

substance next to some money and a box cutter,"[13] and photos of the appellant with Ms. MR.[14] Subsequent lab analysis of the blue and white phone case revealed cocaine residue.

In the fallout from the search, the CID agents involved were ordered to secure the video recording of the search and to not disclose any information regarding the search until directed to do so by a military judge. The lead CID agents were removed from further action on the case. The LSSS OIC directed a taint review, including a review of the video recording, by an independent investigating officer. The STC was removed from his position, and the trial counsel was disqualified from any involvement in the appellant's case. Two new trial counsel and new CID investigators were assigned to the case from a Marine Complex Trial Team, a separate chain of command from the Legal Support Services Team led by the STC.

Upon motion from the government, the military judge disqualified 1stLt I and 1stLt F from further representation of the appellant because of a likely conflict of interest and because they had become necessary witnesses at trial.

At trial, the appellant pleaded guilty to violating general orders prohibiting participation in criminal gangs and racist tattoos; use of cocaine and possession of cocaine and methamphetamines with the intent to distribute; larceny of BAH and falsifying a form to effect that larceny; forging false orders to break a residential lease; and conspiracy to assault and assault and battery of his romantic rival. He also pleaded guilty to falsifying a brig visitation roster to indicate that Ms. HK, his new girlfriend, was a family member.

The appellant pleaded not guilty to the offenses related to the assault of Ms. MR. The members convicted the appellant of aggravated sexual contact for grabbing Ms. MR's vaginal area with physical strength or violence sufficient to overcome, restrain, or injure her and assault consummated by battery for strangling Ms. MR with his hands.

## II. DISCUSSION

### A. Search of the appellant's cell phone

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. amend. IV. Evidence obtained in violation of the Fourth Amendment is generally inadmissible. MIL. R. EVID. 311. "We review a military judge's ruling on a motion to suppress evidence for

---

[13] Record at 1195-96.

[14] Record at 1194; PE 15.

an abuse of discretion, viewing the evidence in the light most favorable to the party prevailing below." *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016). We review the military judge's findings of fact for clear error and conclusions of law *de novo. Id.*

At trial, the military judge denied the appellant's motion to suppress the results of the search for, and of, the appellant's phone.[15] The appellant argues that the military judge abused her discretion because: (1) the "search of the cell phone data was illegal because the CASS did not authorize it to be searched;" and, 2) even if it authorized a search, the CASS was overbroad "because it did not contain any search protocols, nor did it list with particularity the places to search on [the appellant's] cell phone[.]"[16]

*1. Did the CASS authorize a search of the cell phone's contents?*

The CASS provided that "there is reason to believe that on the person of and/or on the premises known as" 1stLt I and 1stLt F and the defense counsel offices, "[t]here is now being concealed certain property," the appellant's "personal cellular telephone," and that the CID agent is "hereby authorized to search the person and/or place named for the property specified and if the property is found to seize it."[17]

The appellant now argues that because the CASS authorized seizing the phone but did not directly address searching the contents of the phone, any evidence discovered on the phone—namely photographs and text messages—must be suppressed. We disagree.

First, we acknowledge the "unremarkable" conclusion that "cell phones may not be searched without probable cause and a warrant unless the search and seizure falls within one of the recognized exceptions to the warrant requirement." *United States v. Wicks*, 73 M.J. 93, 97-99 (C.A.A.F. 2014) (citations omitted) (suppressing evidence obtained from a cell phone where the "Government proceeded without a warrant or search authorization" to

---

[15] AE CLXXIV at 17.

[16] Appellant's Brief of 29 Jul 2016 at 34. The appellant also argues that the military judge "failed to address the search of [the appellant's] cell phone data" in her ruling. *Id.* We disagree, given that under the heading "conclusions of law," the military judge stated that the search authority "authorized two searches," one of the defense spaces *for* the phone, and one *of* the phone "to obtain the evidence of the alleged offenses." AE CLXXIV at 13-14. "Where a finding of fact is included under the heading of conclusions of law it will be treated as a factual finding." *Utzinger v. United State*s, 432 F.2d 485, 489 (6th Cir. 1970) (citation omitted). In light of the lead CID agent's affidavit, discussed *infra*, these findings of fact are not clearly erroneous.

[17] AE XIII at 64.

execute three searches of the contents of the cell phone, including "over 45,000 text messages").

Modern cell phones are a door to a house with an infinite number of rooms, and those rooms can be filled with all of the most personal markers of our private lives. There are few places so desirous of protection from government intrusion. As a result, we find that the agents in this case were required to seek authorization to search based on probable cause before searching the contents of the appellant's cell phone. However, in reviewing the scope of a search authorization that was reduced to writing, we are not constrained to the four corners of that writing. We may also rely on affidavits, attachments, and testimony to discern the intent of those seeking and granting the authorization and to establish the bounds of probable cause.[18]

This is similar to the approach taken by our sister court in *United States v. Richards*, No. 38346, 2016 CCA LEXIS 285, unpublished op. (A.F. Ct. Crim. App. 2 May 2016), *rev. granted*, 76 M.J. 45 (C.A.A.F. 2016).[19] In *Richards*, the Air Force Court of Criminal Appeals (AFCCA) rejected Richards' argument that, because the search authorization only broadly listed his residence as subject to search and electronic media devices as the items to be seized, the investigators did not have authorization to search the contents of the seized devices. *Id.* at *44-45. The AFCCA noted that "the affidavit accompanying the written search authorization" and "[t]estimony from [investigative] agents at trial makes clear they were seeking authorization to search the devices, not just seize them." *Id.* (internal quotation marks omitted).[20]

Here, the lead CID agent twice requested authority to search the appellant's "personal Android . . . cellular telephone," once in the body and once on the cover sheet (signed by the search authority on both the front and

---

[18] *See United States v. Allen*, 53 M.J. 402, 404, 407-08 (C.A.A.F. 2000) (noting that where a "warrant . . . authorized only a search of appellant's residence" for child pornography, the information in the investigator's affidavit nevertheless also justified a search of the digital contents of the "appellant's computer equipment and associated materials").

[19] *Richards* is pending review by the Court of Appeals for the Armed Forces only as to whether the "search authorization was overbroad in failing to limit the dates of the communications being searched," and as to whether the Court of Criminal Appeals panel that heard Richards' case was "improperly constituted."

[20] *See also United States v. Eppes*, No. 38881, unpublished op., 2017 CCA LEXIS 152, at *15 (A.F. Ct. Crim. App. 21 Feb 2017) ("[B]ased on the facts developed by the military judge, we are satisfied the intent of the warrant was to authorize the examination of computer hardware seized . . . .").

back page) of the "Affidavit In Support Of Application For Search Authorization."[21] The cover sheet cites the lead agent's:

> Belie[f] that there is now being concealed certain property, namely: . . . . Electronic media, communications, and data files pertaining to the kidnapping, assault, and sexual assault of [Ms. MR]; defrauding the U.S. Marine Corps; sale and use of illegal drugs; affiliation with an Outlaw Motorcycle Gang; and possessing a swastika tattoo on [the appellant's] abdomen.[22]

The Area Commander then signed the search authorization prepared by the lead agent. Based on this, we find that the Area Commander intended to authorize the requested search of the contents of the appellant's cell phone once it was seized.

### 2. Was the CASS overbroad?

The appellant next argues that the search of his cell phone's contents was overly broad because it neither "list[ed] with particularity the places to search on [the] cell phone," nor contained "search protocols."[23] We review *de novo* a claim that a search "authorization was overly broad" such that it "result[ed] in a general search prohibited by the Fourth Amendment." *United States v. Eppes*, 2017 CCA LEXIS 152, at *13 (A.F, Ct. Crim. App 21 Feb 2017) (citing *United States v. Maxwell*, 45 M.J. 406, 420 (C.A.A.F. 1996)).[24] "[W]e examine both the warrant and the supporting affidavit to determine whether the search identifies the crimes committed and the items which

---

[21] AE XIII at 51; 62-63.

[22] *Id.* at 51.

[23] Appellant's Brief at 34. Even though limits to the location to be searched may be described as search "protocols," the appellant also raises other concerns (e.g. "[t]o what degree the search and analysis is done by automation, computer software, or actual agents; [h]ow it will determine what types of files, or the files themselves, that fall within the ambit of the probable cause") related to the methods used to conduct the search. *Id.* at 37. As a result, we address the question of over-breadth in the locations to be searched, separately from the issue of other search protocols.

[24] At trial, the appellant did not directly allege that the search of the cell phone was overly broad because it failed to specifically list the places to be searched—the over-breadth claim at trial was that the search of the defense counsel spaces was overly broad. AE XVII at 8-9. However, in claiming that the CASS was "not based on probable cause," trial defense counsel averred that there was no "reason to believe that other text messages or pictures" besides the messages between the appellant and Ms. MR the day of the alleged assault, "would be included on the phone." *Id.* at 8. As this argument implies that a search of the phone's pictures was overly broad, we find that the appellant did not forfeit the over-breadth argument as to the places to be searched on the cell phone.

could be evidence of those crimes." *Id.* at \*15 (citing *United States v. Martinelli*, 454 F.3d 1300, 1308 (11th Cir. 2006)).

a. Failure to limit the search to particular places on the cell phone

The appellant asserts that the examination of the forensic copy of his cell phone—a copy that included "every text message, email, Facebook chat, instant message, picture, video, and web-browsing history" accessed on the appellant's phone—exceeded the scope of the search authorization and was therefore overly broad in that it "exceeded the Government's probable cause for [the appellant's] suspected offenses."[25]

The appellant's argument is supported, in part, by some civilian courts that have suggested the Fourth Amendment's "particularity" language requires search warrants to specify how the government will determine which locations in a cell phone may be searched for data.[26] However, the Court of Appeals for the Armed Forces (CAAF) has not enforced a similar prophylactic requirement for all military search authorizations of electronic media. Instead, particularity in the search authorization must be determined on a case-by-case basis.

In some rare and unique cases, probable cause could support a search of one's entire cell phone. In these cases, the search authorization would need only list a description of the cell phone without any greater specificity. But in most cases, probable cause would permit a search of only some divisions of the phone's storage, and the search authorization would need to be tailored accordingly. However, once again we may rely on the ancillary documents, affidavits, and attachments to determine where probable cause has placed natural limits on the scope of the authorization, limiting the search authority to those places on the phone that were reasonably implicated by probable cause. In other words, an authorization to search digital media like cell phone data, meets constitutional particularity requirements when the areas to be

---

[25] Appellant's Brief at 40-41.

[26] *See In re The Search of Premises Known as: A Nextel Cellular Tel. with Belonging to & Seized from*, 2014 U.S. Dist. LEXIS 88215, at \*37, 41 (D. Kan. Jun. 26, 2014) ("[P]robable cause to believe drug trafficking communication may be found in [the phone's] mail application will not support the search of the phone's Angry Birds application."). *But see United States v. Burgess*, 576 F.3d 1078, 1093-94 (10th Cir. 2009) (noting that "[i]t is unrealistic to expect a warrant to prospectively restrict the scope of a search" of files "by directory," as "[o]ne would not . . . expect a warrant to . . . prospectively restrict the search to . . . 'file folders labeled 'Meth Lab' or 'Customers'").

searched are "clearly related to the information constituting probable cause." *Allen*, 53 M.J. at 408.[27]

Here, the affidavit listed the crimes about which the lead agent sought to discover evidence.[28] The lead agent's affidavit also stated that Ms. MR provided digital images to CID of the appellant wearing gang clothing and symbols, leading the agent to believe the cell phone would have evidence of the appellant's gang involvement.[29] The lead agent further averred that based on her training and experience she expected that "person(s) associated with the use and sale of illegal drugs typically negotiate prices, set up meetings to conduct buys, and exchange photographs and/or videos of products," and that those in "gang affiliated activities communicate regularly via cellular telephone, exchange messages, photographs and videos."[30] The affidavit further provided that the appellant tested positive for cocaine in a command urinalysis and that Ms. MR reported having "seen [the appellant] possessing and using cocaine and crystal methamphetamine," and "weighing and packaging the illegal drugs in preparation to sell them[.]"[31] This supported the lead agent's assertion to the search authority that there was "probable cause to believe evidence of his use, possession, manufacture or sale of illegal drugs [was] contained on his cellular telephone."[32]

We find that the search authorization was not unconstitutionally overbroad. The affidavit's description of potential drug, gang, sexual assault, and kidnapping charges served to focus the investigatory effort. The affidavit

---

[27] In *Allen*, the CAAF held that a warrant which stated in its supporting affidavit that a search for child pornography on Allen's "digitally stored files on computer disks or hard drives," without otherwise listing specific locations on the drives, was "not general or overbroad." *Id.* at 407-08. Similarly, in *Richards* the AFCCA held that a broad search of digital copies of Richards' electronic devices was "not constitutionally overbroad." 2016 CCA LEXIS 285, at *49, 59. Even though the child victim's statements to investigators did not say that Richards had "shared pictures or videos" in their online chats, a search of the pictures folder in Richards' devices did not exceed the scope of the search authorization. *Id.* at *57, 60 (noting that although the "choice to first search the 'pictures' folder might not have been the most logical place to find . . . evidence . . . it was not an unreasonable place" to search).

[28] AE XIII at 51 ("[T]he request for authorization to search and seize is made in connection with an investigation into the offense(s) of: Article 92, UCMJ—Failure to obey order or regulation, Article 120—Sexual Assault, Article 128—Assault, Article 132—Frauds against the United States, and Article 134–Kidnapping.").

[29] *Id.* at 56, 62.

[30] *Id.* at 52, 58-59.

[31] *Id.* at 56, 61

[32] *Id.* at 62.

provided a substantial basis for probable cause to suspect that the appellant distributed illegal drugs and was a gang member. It then linked those behaviors to cell phone usage. Since the identified locations on the phone to be viewed—e.g., contacts, photos, videos, and messages—were, per *Allen*, "related to the information constituting probable cause," 53 M.J. at 408, the authorization provided sufficient limits to deter government "rummaging" through the phone in areas where evidence of a crime might not reasonably be located.[33] As a result, the authorization was not general or overbroad.

Finally, even if the government exceeded the scope of its authorization when it created a forensic copy of the entire contents of the phone, including the analytical data, we find no prejudice under these circumstances in which the only evidence discovered on the phone was found in those areas included in the authorization's probable cause, and the intrusion into other areas appeared—from the meager record provided—to be superficial.[34]

b. Failure to specify search protocols

For the first time, the appellant argues that the failure to specify search protocols makes the CASS unconstitutionally overbroad.[35] Where a "different basis was raised in [the] suppression motion at trial" than on appeal, we review for "plain error." *United States v. Garcia*, 57 M.J. 716, 718-19 (N-M. Ct. Crim. App. 2002) (citing *United States v. Musa*, 45 F.3d 922, 924 (5th Cir. 1995)). As the appellant did not argue at trial that the images should be suppressed for failure to follow particular search protocols, we review for plain error.

To show plain error, the appellant must persuade this court that: "'(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *United States v. Tunstall,* 72 M.J. 191, 194 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)). The plain error doctrine is "to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Causey*, 37 M.J. 308, 311 (C.M.A. 1993) (citations and internal quotation marks omitted).'"Plain' is synonymous

---

[33] Appellant's Brief at 33 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

[34] *See United States v. Blakeney*, 942 F.2d 1001, 1026-27 (6th Cir. 1991) (holding that even where a portion of a warrant impermissibly used the overbroad, "generic term 'jewelry,'" this did "not require suppression of all of the items seized pursuant to the warrant," only of any "jewelry seized pursuant to the overbroad portion of the search warrant"—and since none of this jewelry was introduced into evidence, "Blakeney was not prejudiced by the defect in the warrant").

[35] Appellant's Brief at 37.

with 'clear' or, equivalently 'obvious[,]'" and any plain error "must be so 'under current law.'" *United States v. DeMerse*, 37 M.J. 488, 491 (C.M.A. 1993) (first alteration in original) (citation omitted).

While the use of search protocols may be valuable in guiding investigators, protecting suspects, and educating courts, we are not aware of any authority from our superior court requiring the use of such search protocols in all cases involving the search of electronic media. In light of judicial divergence as to their necessity,[36] we thus decline to find the absence of search protocols in this case to be plain or obvious error. We will not assign to the military judge a responsibility to foresee requirements that we have yet to anticipate.

**B. Unlawful command influence**

"Congress and this court are concerned not only with eliminating actual unlawful command influence, but also with 'eliminating even the appearance of unlawful command influence at courts-martial.'" *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (quoting *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)).

The defense has the burden of raising the issue of actual or apparent unlawful command influence. *United States v. Reed*, 65 M.J. 487, 488 (C.A.A.F. 2008) (citing *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F. 1999)). On appeal the appellant must present "some evidence" of unlawful command influence, showing (1) "facts which, if true, constitute unlawful command influence," (2) "the proceedings were unfair," and (3) "unlawful command influence was the cause of the unfairness." *Biagase*, 50 M.J. at 150 (citations omitted).

"The test for actual unlawful command influence is, figuratively speaking, 'whether the convening authority has been brought into the deliberation room.'" *United States v. Allen*, 31 M.J. 572, 590 (N-M.C.M.R. 1990) (quoting *United States v. Grady*, 15 M.J. 275 (C.M.A. 1982)).

The test for apparent unlawful command influence is objective. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *Lewis*, 63 M.J. at 415. An appearance of unlawful command influence arises "where an objective, disinterested observer, fully informed of all the facts and

---

[36] *Compare Burgess*, 576 F.3d at 1093-94 (criticizing imposition of "filename or extension"—i.e. file type—protocols) *with United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1006 (9th Cir. 2009) (en banc) ("The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents.").

circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

Once some evidence has raised the specter of unlawful command influence, "the government bears the burden of proving beyond a reasonable doubt that either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence.'" *United States v. Boyce*, __ M.J. __, No. 16-0546, 2017 CAAF LEXIS 494 at *16 (C.A.A.F. May 22, 2017) (citing *United States v. Salyer*, 72 M.J. 72 M.J. 415, 423 (C.A.A.F. 2013)). If the government cannot meet this initial burden, then the government must prove beyond a reasonable doubt "that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding." *Id.* at *16-17 (citations and internal quotation marks omitted) (alteration in original).

"'Where the issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that [the] Court reviews *de novo*.'" *Reed*, 65 M.J. at 488 (C.A.A.F. 2008) (quoting *United States v. Wallace,* 39 M.J. 284, 286 (C.M.A. 1994)).

At his court-martial, the appellant made a timely motion to dismiss the charges and specifications on the grounds of unlawful command influence. The military judge determined that the defense presented no evidence of *actual* unlawful command influence, concluding: "The actions of the CID investigators, trial counsel and area commander in this case were not an effort to influence the outcome of the [appellant's] court-martial."[37]

However, the military judge did find some evidence supporting apparent unlawful command influence, namely that the search for the phone extended into the offices of defense counsel with no involvement in the appellant's case. Having shifted the burden, the military judge then found the government met its burden and denied the defense motion.

The appellant now asserts that the appearance of unlawful command influence directly affected the findings and sentence in that "the Government still used evidence seized from [the appellant's] phone at trial,"[38] and the

---

[37] AE CLXXII at 14. Of note, the commander who authorized the search, the 22 Area, Area Commander, was neither the convening authority nor the appellant's commanding officer.

[38] Appellant's Brief at 55.

search led to 1stLt I's and 1stLt F's disqualification as defense counsel and an order for them to testify.

We agree that the appellant has raised some evidence of apparent unlawful command influence. Nonetheless, we are convinced beyond reasonable doubt that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt as to the fairness of the appellant's court-martial, to include the findings and the adjudged sentence.

First, the government took significant corrective action after the search to limit disclosure of any information obtained by CID agents during the search. This included removing the STC, the trial counsel, and the investigators from further involvement with the investigation or court-martial. Newly assigned trial counsel and investigators were not part of the Legal Support Services Team but from the separate Complex Trial Team. The video recording of the search was secured by order until a special investigating officer was appointed to review it for potential leakage of privileged information. Subsequently, the recording was sealed by the military judge who reviewed it *in camera*.

Second, as discussed *supra*, the phone and its contents were seized pursuant to a valid search authorization. Therefore its contents, while both helpful and harmful to the appellant's cause, did not *unfairly* affect the findings or sentence. Likewise, 1stLt I and 1stLt F were disqualified as defense counsel and ordered to testify as a result of their possession of the phone, not as a result of the manner in which the phone was ultimately acquired by the government. Had the government obtained the phone by more ordinary means, 1stLt I and 1stLt F may still have been necessary witnesses as to the chain of custody of the phone and the phone case. Similarly, the eventual conflict of interest between 1stLt I, 1stLt F, and the appellant was not born of the search, but of defense counsels' possession of the phone preceding the search. In that regard, the search was immaterial to the matter of whether to disqualify either defense counsel.

Finally, the best indicator of the lack of apparent unlawful command influence is the fact that the appellant was wholly or partially acquitted of many of the most serious offenses related to the attack on Ms. MR. To the extent the text messages between the appellant and Ms. MR weighed upon the members, they did not prevent them from finding the appellant not guilty of assaulting Ms. MR with a dangerous weapon, assaulting her with an intent or a means likely to cause grievous bodily harm, and communicating threats to her and her daughter.

For these reasons, we are convinced beyond reasonable doubt that the appellant's trial was untainted by the appearance of unlawful command influence.

## C. Prosecutorial misconduct

Prosecutorial misconduct occurs when a prosecutor "'oversteps the bounds of propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

When an appellant objects to alleged prosecutorial misconduct at trial, we review for prejudicial error. *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014). We will accept the military judge's findings of fact unless the findings are clearly erroneous.

Here, the appellant made a timely motion alleging that the actions or inaction of the STC related to the search of the defense offices amounted to prosecutorial misconduct. In denying the appellant's motion, the military judge found:

> Although [the STC] was aware of the Air Force JAG memorandum concerning searches of defense counsel offices and other procedures usually put in place for such types of searches, he did not think that they applied to this situation because the evidence being sought was not a document and the search would not require the review of any documents in an attorney's office.[39]

The appellant asserts that the STC[40] committed prosecutorial misconduct when he supervised the search of defense offices without first implementing safeguards to minimize exposure to attorney work product and

---

[39] AE CLXXVII at 7-8.

[40] In his brief, the appellant alleges that "the Government committed prosecutorial misconduct when it executed an overly-expansive search of the defense spaces[.]" Appellant's Brief at 59. Under the facts of this case, we decline to paint all possible government actors as *de facto* prosecutors, and instead, focus our analysis on the actions or inactions of the STC, in line with the allegation as litigated by the trial defense counsel, analyzed by the military judge, and focused on during oral argument.

privileged communications as discussed in *United States v. Calhoun*, 49 M.J. 485 (C.A.A.F. 1998) and utilized in other jurisdictions.[41]

As highlighted by the appellant, these precautions include: consideration for obtaining the desired information from other sources or through the use of subpoena; conducting the search pursuant to a valid warrant issued by a military magistrate or a search authorization directed by a commander not serving as the convening authority; issuing warrants or authorizations tailored as narrowly as possible; ensuring that only independent personnel are involved in searching the counsel's office and reviewing the materials taken, and that those personnel are provided instructions designed to minimize the intrusion into privileged materials; providing copies of seized records to the subject counsel so that disruption of the counsel's practice is minimized and the counsel is afforded an opportunity to participate in the process of disputing determinations of privilege; and directing personnel conducting the search not to disclose information about the search to prosecutors or investigators until instructed to do so by proper authority.[42]

This non-exhaustive list of safeguards utilized by U.S. Attorney's offices and, in part, tacitly endorsed by the CAAF in *Calhoun*, provides an excellent framework for future searches of opposing counsel offices–a rare event inherently fraught with potential for error. These or similar procedures may also assist in satisfying the requirements of the Navy Judge Advocate General Instruction 5803.1E, Professional Conduct of Attorneys Practicing under the Cognizance and Supervision of the Judge Advocate General (JAG PR), Enclosure (1), Rule 3.8b (20 Jan 2015), which provides that:

> [T]rial counsel and other government counsel shall exercise reasonable care to avoid intercepting, seizing, copying, viewing, or listening to communications protected by the attorney-client privilege during investigation of a suspected offense (particularly when conducting government-sanctioned searches where attorney-client privileged communications may be present), as well as in the preparation or prosecution of a case.

However, we decline to hold that these specific procedures rose to the level of a legal norm or standard at the time of the search of the defense spaces. As a result, we do not find the failure to utilize these or similar

---

[41] The appellant relies here on Chapter Nine of the U.S. Attorney's Manual. Appellant's Brief at 58-60.

[42] *Calhoun*, 49 M.J. at 488; United States Department of Justice, U.S. Attorney's Manual, Title 9-13.420, Searches of Premises of Subject Attorneys, https://www.justice.gov/usam/usam-9-13000-obtaining-evidence#9-13.420, (last visited 28 May 2017).

precautions resulted in prosecutorial misconduct. Still, based on the cautionary tale of this case, prosecutors should ensure that specially tailored safeguards, like those used in *Calhoun,* are prophylactically applied in all future cases in which they are participants in the planning and execution of a search of opposing counsel's spaces.

Even if the failure to apply these safeguards before the search amounted to misconduct on the part of the STC, we find no prejudice.

In assessing for prejudice, we look at the cumulative impact of any misconduct on the appellant's substantial rights and the fairness of his trial by balancing "three factors:  (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Fletcher*, 62 M.J. at 184. Prosecutorial misconduct requires reversal when the trial counsel's behavior, taken as a whole, was "so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *Id.*

### 1. *Severity of the misconduct*

While the STC maintained supervisory responsibility for the trial counsel in his Legal Services Support Team, he was not specifically detailed to the appellant's case. Despite this, he was regularly involved in discussing case matters with the detailed trial counsel, and once the possibility of the search of the defense offices became more likely, he also engaged his counterpart, the senior defense counsel, in several discussions designed to "reach mutually agreeable terms on relinquishing [the phone] to the government."[43]

After compromise failed, the STC received concurrence from his supervisory attorney and the LSSS OIC that a CASS should be executed. He then contacted CID and arranged for them to search the spaces as soon as defense counsel were present. He also reviewed the CASS and affidavit for legal sufficiency.

When CID arrived at the defense offices, the STC briefed them on the conduct of the search: "I told them that they should execute their search according to the highest standards of their protocols for conducting a search. I told them that the conduct of this search would be highly scrutinized. I ensured they had a video recorder to document the search itself."[44] He did not provide the searchers any additional specific protocol on conducting the search. He provided the searchers no guidance in writing.

---

[43] AE XIV at 59.

[44] *Id.* at 61.

During the search, the STC entered the defense offices three times; once to inform the senior defense counsel of the search, once to determine whether personnel would be permitted to leave the spaces during the search, and once to carry out an administrative function unrelated to the search. The STC did not supervise the CID agents' conduct of the search, observe their search techniques, or provide advice to the agents during the course of the search.

Afterwards, the STC was briefed by the CID agents and was informed that the agents had seized a phone, a case, a charger, and a spare battery. The agents did not disclose any other information to him. The STC asserts that he instructed the agents to secure the evidence and the video recording of the search from examination and to not discuss anything they observed until they were provided further guidance.

This was the sum total of the STC's involvement in the search of the defense offices. While the search of the other defense counsels' offices–those with no direct connection to the appellant–raises the specter of unlawful command influence and demands greater scrutiny of each affected case, the STC's involvement in those parts of the search were still tangential. Additionally, while his failure to enforce more rigorous taint procedures before the search were not best practices, this did not rise to the level of severe misconduct under the circumstances of this case.

### 2. *Measures adopted to cure the misconduct*

Furthermore, any inaction on the part of the STC prior to the search were offset by the robust measures taken to preserve any potential leakage of privileged information undertaken immediately after the search ended.

As discussed above, the searchers were ordered to secure the video recording and not discuss the search until directed to do so. The LSSS OIC directed a taint review of the video recording. The CID agents assigned, including the lead agent, were removed from the case. The STC was removed from his position, and the trial counsel was removed from the appellant's case. Two new trial counsel and new CID investigators from different chains of command were assigned to the case.

### 3. *Weight of the evidence supporting the conviction*

Finally, after weighing the evidence supporting the appellant's conviction for aggravated sexual contact and assault consummated by battery, including the cell phone tower analysis placing the appellant in the area of Ms. MR's home, the medical evidence of Ms. MR's vulvar hematoma, the bruising on her neck consistent with strangling, and the contents of the 9-1-1 phone call, and recognizing that we did not see or hear the witnesses, this court is convinced of the appellant's guilt beyond a reasonable doubt.

For these reasons, even were we to determine that the STC's actions or inaction related to the search rose to the level of misconduct, we find no prejudicial error.

## D. Disqualification of defense counsel

The appellant argues he was denied his Sixth Amendment right to counsel when the military judge disqualified 1stLt I and 1stLt F from further participation as the appellant's defense counsel.

Prior to court-martial assembly, the government moved to disqualify both defense counsel asserting that they were potential witnesses at trial based on their possession of the appellant's cell phone during the month preceding the search of the defense offices. The government alleged that counsel's testimony was necessary to account for the deletion of text messages and gang member contact information from the phone—evidence of the appellant's guilty mind—and to discount sources of cocaine residue on the phone's case other than the appellant. This raised both a conflict of interest issue and a concern over defense counsel operating as unsworn witnesses.

To ameliorate these concerns, the military judge sought from the appellant a waiver of any conflict, identifying the conflict as the foreclosure of possible defenses by the appellant should he choose to implicate his counsel in deleting potentially incriminating matters from his phone or in cross-contaminating his phone with cocaine from another source inside 1stLt I's or 1stLt F's desk drawers. After speaking with conflict-free counsel, the appellant asserted that he understood the nature of the conflict and waived the right to conflict-free counsel.[45]

The military judge also encouraged the parties to stipulate to defense counsel's testimony regarding their possession of the appellant's phone, resolving a possible violation of JAG PR Rule 3.7 that generally prohibits counsel from appearing as a witness on a contested matter.

After the parties failed to reach a stipulation, the military judge disqualified counsel, finding that defense counsel's reluctance to stipulate may have evidenced a desire to limit their own exposure under the JAG PR rules. If so, then the conflict of interest "likely ran deeper than [the appellant] understood and knowingly waived."[46] She also found that 1stLt I and 1stLt F

---

[45] We highlight *United States v. Hale*, ___ M.J. ___, No. 201600015, 2017 CCA LEXIS 364, at *42-43 (N-M. Ct. Crim. App. 31 May 2017), demonstrating the difficulties that may arise—unlike here—when the military judge for whatever reason is unable to identify possible conflicts of interest, inquire into the nature of those conflicts, and resolve them, if necessary, through waiver or disqualification.

[46] AE CLXXVIII at 18.

would be the only sources of information concerning the handling of the phone and would thus be necessary witnesses on a potentially contested issue at trial.

The appellant was detailed two new counsel, a Marine Corps major and a captain, who represented the appellant during the rest of the motions hearings, through his pleas, on the merits, and during sentencing proceedings. During the contested portion of trial, 1stLt I and 1stLt F were called to testify, denied deleting any text messages from the phone, and denied placing the phone in a location in which it might come into contact with cocaine. This testimony, when taken in concert with the lab's identification of cocaine residue on the phone's case, corroborated Ms. MR's claim that the appellant regularly kept cocaine hidden between his phone and its case. 1stLt I's and 1stLt F's testimony left unresolved the matter of the missing text messages.

The Sixth Amendment to the Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Once an attorney-client relationship has been established, it may be severed only for "good cause" unless the relationship has been terminated with the consent of the member. RULE FOR COURT-MARTIAL 505(d)(2)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); *United States v. Spriggs*, 52 M.J. 235, 240 (C.A.A.F. 2000).

Good cause may exist when a conflict of interest places in doubt the ability of defense counsel to be an effective advocate. "[W]here a constitutional right to counsel exists . . . there is a correlative right to representation that is free from conflicts of interest." *United States v. Lee*, 66 M.J. 387, 388 (C.A.A.F. 2008) (quoting *Wood v. Georgia,* 450 U.S. 261, 271 (1981)). An accused may waive this right to conflict-free counsel, but this must be done voluntarily and with "sufficient awareness of the relevant circumstances and likely consequences" as to be knowing and intelligent. *Id.* (quoting *Brady v. United States,* 397 U.S. 742, 748 (1970) (internal quotation marks omitted)). The military judge must be allowed substantial latitude in refusing to accept an appellant's waiver of a conflict of interest "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat v. United States*, 486 U.S. 153, 163 (1988).

Good cause may also exist when the conflict creates the appearance of unfairness to observers or threatens to undermine ethical standards. *Id.* at 160. Both a potential ethical conflict and the appearance of unfairness may arise when a counsel becomes a witness at court-martial.

"An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993). "His role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Id.*

To that end, JAG PR Rule 3.7 prohibits counsel from acting as an advocate at a trial in which he or she is likely to be a necessary witness, unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and quality of the legal services rendered; or (3) disqualification of counsel would work substantial hardship on the client.

We review a military judge's decision to disqualify counsel for an abuse of discretion. *United States v. Strother,* 60 M.J. 476, 478 (C.A.A.F. 2005). The military judge will be overturned only if the findings of fact are clearly erroneous or the decision is influenced by an erroneous interpretation of the law. *United States v. Rhoades*, 65 M.J. 393, 397 (C.A.A.F. 2008) (citing *United States v. Quintanilla,* 63 M.J. 29, 35 (C.A.A.F. 2006)).

We agree with the military judge that there existed good cause to sever the attorney-client relationship and disqualify 1stLt I and 1stLt F as defense counsel.

First, an actual conflict of interest[47] operated between the interests of the appellant and his counsel as to the contents and whereabouts of the appellant's phone. 1stLt I and 1stLt F possessed the appellant's phone from 24 March 2014 to 2 May 2014. During that time, they powered-on and perused the phone's contents, created and deleted content, connected the phone to their government computers in order to transfer data, removed the phone's case, and discussed turning the phone over to the appellant's then-girlfriend, Ms. HK. This placed 1stLt I and 1stLt F in the position of defending themselves from accusations that they intentionally or negligently destroyed evidence or were the source—through cross-contamination or other means—of the damning cocaine residue evidence. Fear of violating ethical rules also appeared to motivate 1stLt F's attempt to return the phone to Ms. HK (via the appellant's SNCOIC), demonstrating that his own professional concerns had begun to creep into his tactical decision-making. These conflicts ran so deep that the military judge was well within her discretion to refuse to

---

[47] *See Hale,* 2017 CCA LEXIS 364, at *23 ("A conflict of interest is actual, as opposed to potential, when, during the course of the representation, 'the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action.'") (quoting *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003)).

accept the appellant's waiver because it had not been knowingly and intelligently made.

Second, 1stLt I and 1stLt F became necessary witnesses to the trial, each possessing first-hand knowledge regarding their personal possession of the phone. As the military judge noted,

> [T]he members would be able to determine that [1stLt I and 1stLt F] were the only sources of information concerning the chain of custody and the care and handling of the phone and case. The same attorneys would then be arguing to the members concerning this testimony, leading the members to place greater weight on the defense arguments because the counsel clearly had first-hand knowledge of these events.[48]

Such an advantage to the defense would create an appearance of unfairness to an outside observer and seem to violate the prohibition of JAG PR Rule 3.7. As a result, it was appropriate to sever the attorney-client relationship when alternatives to the defense counsel's testimony were no longer viable.

For these reasons, we find that the military judge did not abuse her discretion when disqualifying 1stLt I and 1stLt F as appellant's defense counsel.

### E. Admission of evidence under MIL. R. EVID. 404(b)

While "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character[,]" it may be admissible to prove, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MIL. R. EVID. 404(b)(1) and (2), SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Evidence of this type must be offered for a proper purpose other than to demonstrate the propensity of an accused to commit the crimes charged. *United States v. Acton*, 38 M.J. 330, 333 (C.M.A. 1993) (quoting *United States v. Castillo*, 29 M.J. 145, 150 (C.M.A. 1989)).

In order to admit evidence of uncharged misconduct under MIL. R. EVID. 404(b):  (1) the evidence must reasonably support a finding that the accused committed the uncharged misconduct; (2) a material fact in issue must be made more or less probable by the evidence; and (3) the danger of unfair prejudice must not substantially outweigh the probative value of the evidence. *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).

---

[48] AE CLXXVIII at 18.

We review a military judge's evidentiary rulings for an abuse of discretion, that is, whether the "challenged action [is] arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation and internal quotation marks omitted).

Prior to trial, the government sought a preliminary ruling on the admissibility of various items of evidence under MIL. R. EVID. 404(b)(1) and (2). Specifically, trial counsel sought to introduce the testimony of Ms. MR, relating her knowledge of the various criminal acts for which the appellant had already pleaded guilty, that is: his participation in the criminal motorcycle gang; his possession of cocaine, methamphetamines, and the tools needed to distribute those drugs to others; his use of cocaine and steroids; his fraudulent receipt of BAH; and his swastika tattoo. They also sought to introduce several photographs of the appellant that were also corroborative of his participation in the criminal motorcycle gang and of his possession of drugs.

The military judge issued a written ruling applying the three-part test for admissibility of evidence of uncharged misconduct offered under MIL. R. EVID. 404(b), established in *Reynolds*, and determined that evidence of the appellant's alleged steroid use and additional pictures of his swastika tattoo were inadmissible either because the evidence failed to support the underlying act (the steroid use) or because the probative value was substantially outweighed by the danger of unfair prejudice (the swastika tattoo). The military judge did permit the government to introduce the rest of Ms. MR's testimony and the photographs to demonstrate a possible motive for assaulting Ms. MR—"to protect [the appellant] and the members of the [gang]."[49] The photographs were admitted as Prosecution Exhibits 14, 15 and 16.

Both before the introduction of evidence[50] and again before deliberations,[51] the military judge instructed the members that evidence of other crimes or acts was not admissible to show that the appellant was a bad person, but instead was being introduced by the government to show the motivation of the appellant to commit the offenses alleged.

The appellant now asserts that the military judge abused her discretion by admitting Prosecution Exhibits 14, 15, and 16 (the photographs) into

---

[49] AE CXXXV at 4.

[50] Record at 1104.

[51] *Id.* at 1655.

evidence and by failing to articulate the application of the *Wright* factors[52] in evaluating the third *Reynolds* prong. We disagree.

Here, the military judge admitted the prosecution exhibits only after applying the *Reynolds* test, finding the evidence legally relevant, and determining its probative value was not substantially outweighed by the danger of unfair prejudice.[53] Because the military judge did not articulate any balancing of the *Wright* factors on the record, we will accord her decision less deference than we would otherwise. *United States v. Berry*, 61 M.J. 91, 96 (C.A.A.F. 2005).[54] Regardless, we find that the military judge did not abuse her discretion in admitting the evidence as proof of the appellant's motive, and further conclude that the military judge appropriately directed the members to limit their consideration of the evidence to its proper uses.

**F. Errors in the court-martial order**

As identified by the appellant and conceded by the government, the promulgating order fails to reflect that the military judge dismissed Specification 1 of the Third Additional Charge IV as multiplicious with Specification 2 of the Third Additional Charge II after the members found the appellant not guilty of the greater offense under the charge but guilty of the lesser included offense of assault consummated by battery. The appellant does not assert, and we do not find, any prejudice resulting from this error. Nevertheless, the appellant is entitled to have the court-martial order accurately reflect the results of the proceedings. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). We thus order corrective action in our decretal paragraph.

---

[52] The *Wright* factors as first set out in *United States v. Wright*, 53 M.J. 476 (C.A.A.F. 2000) and subsequently articulated in *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) are: "the strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties."

[53] AE LXXI.

[54] We also find the *Wright* factors to be largely inapt when applied to this case involving the appellant's possible motives to commit the alleged crime as analyzed solely under MIL. R. EVID. 404(b).

## III. CONCLUSION

The findings and the sentence are affirmed. The supplemental court-martial order shall reflect that Specification 1 of the Third Additional Charge IV was dismissed.

Senior Judge CAMPBELL and Judge HUTCHISON concur.

For the Court

R.H. TROIDL
Clerk of Court